THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ELMO GILBERT, Defendant-Appellant.

First District (5th Division)   No. 61163

Opinion filed March 12, 1976.—Rehearing denied June 16, 1976.

William H. Wise, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Michael E. Shabat, and Mary C. Martin, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE SULLIVAN delivered the opinion of the court:

In a bench trial, defendant was convicted of murder and sentenced to a term of not less than 15 nor more than 30 years. Pretrial motions to suppress statements of defendant to police officers and certain physical evidence taken from the scene were made, as well as a motion to quash the arrest. These motions were denied. However, on appeal, defendant raises only the contentions that (1) the evidence was insufficient to establish guilt beyond a reasonable doubt; (2) the statements allegedly made by him were improperly admitted; (3) certain physical evidence—a shotgun, an expended shell, and a gun case—were improperly received in

evidence; and (4) the trial judge erred in conducting a private investigation of the shotgun.

Two police officers were on patrol when they were stopped by a Mr. Shores, who informed them that a woman in a nearby building had been shot. One of them, Officer Gulley, testified that when they arrived at the building he saw defendant bending over a woman who was lying in the hallway. He then observed defendant pick up the upper portion of the woman and then place her back down. There was blood all around the woman and a path of blood from the hallway to the kitchen of the apartment in which defendant and the woman lived. No one else was present in the hallway or in the apartment, and when defendant was asked what happened he replied that he was in the bedroom when she came into the apartment and said she was going to the kitchen for something to eat. He then arose to change the record on his record player when he heard a noise which sounded like "wham." He said nothing else. The officer examined the woman who appeared to be dead and noted a wound in the upper right portion of her back. He also found a shotgun on the floor in the kitchen.

A police technician testified he took possession of a shotgun, a shell, some clothing of the victim, and a gun case. He and his partner brought these articles to the crime laboratory, where they were inventoried. Together they brought these items to court, where he identified the shotgun from the tape which had been wrapped around the butt and from the serial number which he had recorded on the day of the shooting.

A pathologist testified that his autopsy disclosed a shotgun wound in the back of the deceased below the right shoulder blade which, in his opinion, was the cause of death; that it was "very, very unlikely" that the wound was self-inflicted because of the height and slight obesity of the victim, as well as the trajectory of the pellets into her at an upward angle of 45 degrees. He also testified that the deceased was under the influence of alcohol at the time of her death.

A police homicide investigator testified that when he arrived at the scene he saw a woman lying face up in the hallway. There was a shotgun in the kitchen, and he saw trails of blood and scuff marks in the kitchen and through the apartment to the front door. The back door was bolted shut and it had been painted over, so that he was unable to open it. All the windows were secure, and there were no signs of a forcible entry or any indications of a struggle. He interviewed Leola Sutton, a neighbor, and he then went to the first area homicide unit, where defendant was present in an interview room, and advised him of his rights—which defendant indicated he understood. He stated that defendant then gave substantially the same statement concerning the occurrence as he had given to Officer

Gulley but, in addition, he said that the deceased might have committed suicide. In answer to a specific question, defendant stated that only he and the deceased were in the apartment at the time of the shooting.

Leola Sutton testified that deceased had visited her apartment in the same building earlier that evening, and while she was there defendant came and asked for her. The witness told him that deceased was there, and she stated that he stood at the front door for a while and then left— after which deceased left by the back door. Defendant returned later, again looking for deceased, and on this occasion had words with the son-in-law of the witness who, after being struck by defendant, threw him to the floor. At that time she noticed that defendant "kept his leg sticking straight out—like he couldn't bend the leg" and she thought he had a shotgun in his pantleg.

Defendant testified on his own behalf that he had been living with deceased but that she was not at home when he went to bed. She came in after midnight, and he then got up, went to the living room and rejected a record playing on the phonograph. After doing so, he came back through the apartment to the kitchen where he saw deceased staggering out of the back room with a shotgun under her arm. The barrel of the weapon was extended downward, as a hunter would carry such a gun. When he asked what she was doing, he received no reply. Instead, she turned away and started through the doorway to the back bedroom. Believing he was close enough to grab the weapon, he took hold of the gun by the stock—but the deceased swung back with her elbow and arm and the gun struck the facing of the door and the refrigerator. In so doing, it was discharged and deceased was shot in the back. He put on some clothes and then went outside and unsuccessfully tried to find the police. He went down the street, got into his car and double-parked in front of the apartment building. He then returned to the apartment and attempted to pick up deceased to get her to the hospital, but was unable to do so. He had seen Mr. Shores on the street and asked his help to get deceased to the hospital, but Shores refused to do so but did agree, at defendant's request, to get the police.

When he was first questioned by the police, he stated that he was confronted by a large number of policemen who were hollering and calling him a murderer, and that he was scared. He denied that he at any time pointed a weapon at deceased or shot her in the back, and he stated that he never intentionally or knowingly shot deceased.

OPINION

■■ In a trial for murder, the corpus delicti consists of two essential elements—the fact of death, and the fact that it was produced by the criminal agency of some person. (*People v. Garrett*, 62 Ill. 2d 151, 339

N.E.2d 753; *People v. Manske,* 399 Ill. 176, 77 N.E.2d 164; *People v. Bentley,* 357 Ill. 82, 191 N.E. 230.) Both of these elements must be established beyond a reasonable doubt. (*Garrett, Manske.*) Here, there is no question of the fact of death; however, defendant contends that there remains a reasonable doubt as to his criminal agency.

Where a conviction of murder rests solely upon circumstantial evidence, the guilt of the defendant must be so thoroughly established as to exclude every other reasonable hypothesis. (*Garrett; People v. Lewellen,* 43 Ill. 2d 74, 250 N.E.2d 651; *People v. Willson,* 401 Ill. 68, 81 N.E.2d 485; *People v. Ahrling,* 279 Ill. 70, 116 N.E. 764; *Mooney v. People,* 111 Ill. 388.) Here, it is contended that there remains a reasonable hypothesis consistent with innocence; namely, the account given by defendant at trial.

■■ We note that defendant was the only witness to the shooting and that the trial judge, in rejecting his testimony concerning the occurrence, relied to a considerable extent upon a private examination of the shotgun in question. The record discloses that, after final arguments, the court declared a recess, stating: "The court will review its notes. If I may have the weapon, gentlemen, that is the only other item of evidence I will need." Then, following a short recess, the court stated the following:

"Gentlemen, the Court has reviewed the evidence for the purpose of my finding.

I would state for the record I can understand the reason for Elmo Gilbert, or anyone in his stead for giving the reasons given to the police immediately after the incident, for giving or saying a story which is now contrary to that which he now states. The essence therefore of this case is really in total boils down to the statements of the defendant himself, Elmo Gilbert, when he took the stand.

I have examined the weapon in question and whether the fact it was cocked or not cocked in the manner and shape in which the defendant Elmo Gilbert described the accident as happening which is his interpretation and version of this incident, I find it implausable [*sic*] and therefore unbelievable that it occurred in the manner and form in which you describe it, Mr. Gilbert.

Accordingly, therefore, I would find that you are guilty as charged to the crime of murder and I would so find you guilty therefor."

Our examination of the record reveals that the police investigator testified that the gun did not have a hair trigger, and this appears to be the only testimony concerning the facility with which the gun would discharge. No ballistics evidence or other expert opinion testimony was introduced as to the possibility or impossibility of the gun discharging if

struck against an object or if dropped as related by defendant. In view of this lack of evidence, defendant contends that the trial judge arrived at his determination that defendant's account was "implausible" by performing tests upon the gun in chambers. The trial judge seems to affirm that fact by his remarks, indicating he had "examined" the weapon both in its cocked and uncocked position and concluded in effect that the gun would not have discharged in the manner stated by defendant. Defendant argues that it is reasonable to infer that this conclusion could only have resulted from tests performed by him, and that it was error for the court to have relied on such private tests of the weapon out of the presence of the parties.

As a general rule, it is presumed that a trial judge has considered only competent evidence (*People v. Burts*, 13 Ill. 2d 36, 147 N.E.2d 281; *People v. Burress*, 3 Ill. App. 3d 408, 279 N.E. 2d 523), but this presumption may be rebutted by the recorded statements of the trial judge (*People v. Wallenberg*, 24 Ill. 2d 350, 181 N.E.2d 143), A corollary rule proscribes private investigations by trial judges during bench trials regardless of the nature of the information gathered. *People v. Cooper*, 398 Ill. 468, 75 N.E. 2d 885; *Burress*.

The question of the propriety of a trier of fact examining or testing exhibits arises most frequently in jury trials. In an annotation at Annot., 95 A.L.R. 2d 351 (1964), entitled "Tests or Experiments in Jury Room," the author, at page 355, summarizes his conclusion:

"It is a fundamental rule that jurors may not receive evidence out of court, and therefore, insofar as alleged tests or experiments carried out by the jury during deliberations have the effect of introducing new evidence out of the presence of the court and parties, such tests and experiments are improper and, if the new evidence in question has a substantial effect on the verdict, prejudicial." (Footnotes omitted.)

In 53 Am. Jur. *Trial* §896, (1945), the following appears:

"A jury may not conduct experiments which have the effect of putting them in possession of evidence not offered at the trial. Jurors conducting such an experiment are guilty of misconduct warranting a new trial, unless in the circumstances no prejudice results, as where the verdict has already been agreed upon and is clearly right. Improper experiments include experiments with firearms to test the truth of testimony, and ascertainment by jurors for themselves whether voices can be heard out-of-doors, whether signatures can be perfectly traced, or whether a worn shoe would make tracks described at the trial."

The rule in Illinois is the same. See *People v. Clark*, 301 Ill. 428, 134 N.E.

95; *Cooper; People v. Elias*, 316 Ill. 376, 147 N.E. 472; *Albert v. Albert*, 340 Ill. App. 582, 92 N.E.2d 491; 89 C.J.S. *Trial* §574 (1955).

We are of the opinion that the same rule should be applied in the review of bench trials and, in the instant case, we think that the shotgun itself could not have assisted the trial judge in reaching his conclusion. It was only by testing or other experimentation that he concluded the gun did not discharge readily. It appears to us from his remarks that the trial judge's determination of the implausibility of defendant's account of the shooting rested, at least in part, on his testing of the weapon out of the presence of the parties. His comments rebutted the presumption that only competent evidence was considered. (See *Burts* and *Wallenberg*.) We are further of the belief that this determination was crucial in that it rejected defendant's account of the occurrence and thus, under the facts here, removed any reasonable hypothesis consistent with his innocence.

For the reasons stated, we are of the opinion that the reliance by the trial judge on his private testing of the gun was improper; that defendant was prejudiced thereby and that he should be given a new trial.

In view of this holding, it will not be necessary to discuss in detail the other contentions of defendant. We note, however, our belief that the statements of defendant were properly received in evidence as were the shotgun, the shell and the gun case.

Accordingly, the judgment herein is reversed, and the cause is remanded for a new trial.

Reversed and remanded.

BARRETT and DRUCKER, JJ., concur.