(No. 48675.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant,
v. ELMO GILBERT, Appellee.

*Opinion filed Sept. 20, 1977.—Rehearing denied Nov. 23, 1977.*

William H. Wise, of Chicago, for appellant.

William J. Scott, Attorney General, of Springfield, and Bernard Carey, State's Attorney, of Chicago (James B. Zagel and Jayne A. Carr, Assistant Attorneys General, of Chicago, and Laurence J. Bolon, Michael E. Shabat, and Mary C. Martin, Assistant State's Attorneys, of counsel), for the People.

MR. JUSTICE UNDERWOOD delivered the opinion of the court:

In a bench trial in the circuit court of Cook County, the defendant, Elmo Gilbert, was found guilty of murder and sentenced to a term of 15 to 30 years in the penitentiary. The appellate court reversed and remanded for a new trial on the ground that the trial judge had conducted an improper experiment in chambers with a shotgun which had been admitted in evidence. (38 Ill. App. 3d 816.) We allowed the People's petition for leave to appeal.

At approximately 3:30 a.m. on December 3, 1972, Chicago police officer Everett Gully and his partner were on routine patrol when they were stopped by a Mr. Shores, who told them that a lady had been shot in the apartment building at 4639 South Langley Street. The officers went to that address, entered the building and saw the defendant bending over a woman, later identified as Elizabeth

Samuels, who was lying in a pool of blood on the hallway floor just outside the apartment in which she and defendant lived. Defendant, who had wet blood stains on his pants and shoes, attempted to lift her up with both hands, but then put her back down. The woman had a wound in her back near the right shoulder blade and appeared to be dead. When Officer Gully asked what had happened, the defendant responded that he had been in the bedroom of their apartment when the deceased came home; she said she was hungry and was going to the kitchen to fix some food; as she left the room, he went to the record player in the living room to change the record; he then heard a noise that sounded like "wham." Defendant made no further statement at that time.

Officer Gully then followed a trail of blood leading from the woman's body into the apartment through a small living room and bedroom and down an interior hallway where a shotgun and a gun case were found on the floor. Blood was also discovered in a back bedroom near the kitchen. No one else was present in the apartment or in the outside hallway.

There was testimony that the gun was a .20-gauge single-shot shotgun with black friction tape wrapped around the butt. There was one spent shell in the chamber at the time it was recovered from the kitchen floor. Measurements of the gun indicated that the barrel was 26 inches in length and the distance from the end of the barrel to the trigger was 28 inches. There was further testimony that the gun did not have a hair trigger.

A police homicide investigator testified that when he arrived at the scene, he found the deceased lying on her back in the hallway immediately outside the apartment door. He observed wet blood in various rooms of the apartment and the existence of what appeared to be drag marks through the blood. An examination of the apartment indicated that the rear door was bolted shut, the

windows were secure, and there were neither signs of forcible entry nor any indication of a struggle in the apartment. After interviewing Leola Sutton, who lived in an upstairs apartment, the investigator returned to the police station, where he advised the defendant of his rights and conducted an interview. When the defendant was asked about the incident, he gave substantially the same statement he had previously given to Officer Gully but added that he thought the deceased might have committed suicide. In response to a specific question, the defendant also stated that he and the victim were alone in the apartment at the time of the shooting.

A pathologist who performed an autopsy on the body of Elizabeth Samuels testified that the victim was 5 feet 5 inches tall and slightly obese. In his opinion, the cause of death was a shotgun wound in the back below the lower angle of the right shoulder blade. Shotgun pellets had entered her body at an upward angle of 45 degrees. In view of these facts he was of the opinion that it was "very, very unlikely" that the wound had been self-inflicted. He further testified that the deceased was under the influence of alcohol at the time of her death. A police mobile unit technician also testified that, other than the apparent gunshot wounds, he did not notice any cuts, bruises, scratches, lacerations or other wounds on the body.

Leola Sutton testified that she lived in a second-floor apartment in the same building in which the defendant and the deceased resided. On the night in question, decedent came up to her apartment at about 9 p.m. About 15 or 20 minutes later, the defendant came up and asked if she was there. The witness told him yes, and the decedent then got up and went into the washroom. The defendant stood at the door for a few minutes, but then left and went back downstairs. Shortly thereafter, decedent left the Sutton apartment by the back door. The defendant returned twice more to the Sutton apartment that night looking for

decedent and was told that she had left by the back door. During one of the latter two visits the defendant became involved in an altercation with Leola Sutton's son-in-law. At that time, the witness noticed that the defendant kept his "leg sticking straight out," and she saw something black at his waistline from which she concluded that he may have had a shotgun in his pants leg.

Testifying in his own behalf, the defendant stated that he was alone in the apartment when he went to bed between 9 p.m. and midnight. Sometime after midnight he woke up and went to the living room to reject a record which had been playing on the phonograph. After doing so, he came back through the apartment to the kitchen and saw Elizabeth Samuels come "staggering out of the back room with a shotgun in her arms." The defendant demonstrated to the court how she was holding the gun in her right hand with her hand and the shotgun extended downward in the manner a hunter would carry a gun while walking. When he asked her what she was doing with the gun, she did not say anything, but instead turned around and started to walk away from him through the doorway to the back bedroom. The defendant grabbed the stock of the gun, and she hit back at him with her elbow causing the barrel of the gun to hit the door and the stock to strike the refrigerator on an angle. The gun discharged a single shot which hit the deceased. Defendant "grabbed her and sat her down" and then put on his clothes and went to the corner to try to find the police. Failing to find a policeman, he double-parked his car in front of the apartment and went back inside, where he attempted to pick her up for the purpose of taking her to the hospital. When he was unable to move her outside, he returned to the street, where he saw Mr. Shores and told him there had been an accident and that he needed some help in getting the victim to the hospital. Mr. Shores said he could not help but agreed to get the police.

The defendant explained that the reason he had made statements to the police which were inconsistent with his testimony at trial was that he was scared because seven or eight and maybe as many as 10 policemen were standing over him hollering and calling him a murderer. On cross-examination, however, he stated that only one policeman was present at the time he gave the statement at the police station and that there were not seven or eight policemen standing over him. On cross-examination the defendant also testified that he had gone up to Leola Sutton's apartment only once on the night in question and did not take a gun with him.

During closing argument there was some discussion as to whether the gun could fire without being cocked. The prosecutor also argued as follows:

> "Consider also, Judge, the defendant's testimony here just a few minutes ago was Mrs. Samuels was carrying the gun like this (indicating), her hand on the bottom of the barrel, that he pulled the gun from the stock—not by the trigger, but in the back by the stock and that while he was holding this gun like this (indicating) it hit up against the wall and went off into her back—it just couldn't have happened that way."

Following closing argument, the judge declared a recess to review the evidence, stating: "If I may have the weapon, gentlemen, that is the only other item of evidence I will need." Following a short recess, the court announced its decision as follows:

> "Gentlemen, the Court has reviewed the evidence for the purpose of my finding.
>
> I would state for the record I can understand the reason for Elmo Gilbert, or anyone in his stead for giving the reasons given to the police immediately after the incident, for giving or saying a story which is now contrary to that which he now states. The essence therefore of this case is really in total boils down to the statements of the defendant himself, Elmo Gilbert, when he took the stand.

"I have examined the weapon in question and whether the fact it was cocked or not cocked in the manner and shape in which the defendant Elmo Gilbert described the accident as happening which is his interpretation and version of this incident, I find it implausible and therefore unbelievable that it occurred in the manner and form in which you describe it, Mr. Gilbert.

Accordingly, therefore, I would find that you are guilty as charged to the crime of murder and I would so find you guilty therefor."

The appellate court reversed and remanded for a new trial on the grounds "that the shotgun itself could not have assisted the trial judge in reaching his conclusion" and that "[i] t was only by testing or other experimentation that he concluded the gun did not discharge readily." (38 Ill. App. 3d 816, 821.) It was the court's view that the trial judge had improperly relied upon his private testing of the gun and that his comments rebutted the presumption that only competent evidence was considered.

The State urges the defendant waived the issue by failing to object at the time and by omitting any reference to the alleged error in his written motion for a new trial. This case effectively demonstrates the reason for the rule requiring an objection at trial and inclusion in the post-trial motion. Had defendant complied with either, an opportunity would have been afforded the trial judge to clarify on the record the precise scope of his examination of the gun. Since defendant did neither, we would ordinarily hold the question waived. (*People v. Pickett* (1973), 54 Ill. 2d 280, 282.) However, because that issue is the focal point of the appellate court opinion and the sole basis for the allowed petition for leave to appeal, we consider it.

In a bench trial it is presumed that the trial judge has considered only competent evidence in reaching his verdict. (*People v. Harris* (1974), 57 Ill. 2d 228, 231; *People v. Pelegri* (1968), 39 Ill. 2d 568, 575; *People v. Robinson* (1964), 30 Ill. 2d 437, 439.) While this presumption may

be rebutted where the record affirmatively shows the contrary (*People v. Wallenberg* (1962), 24 Ill. 2d 350; *People v. Grodkiewicz* (1959), 16 Ill. 2d 192), we are of the opinion that the record before us does not contain such a contrary showing.

The rule in Illinois and other jurisdictions is that it is improper for the trier of fact to conduct experiments or private investigations which have the effect of producing evidence which was not introduced at trial. (*E.g., Harris; Wallenberg; People v. Thunberg* (1952), 412 Ill. 565; *People v. Rivers* (1951), 410 Ill. 410; *People v. McMiller* (1951), 410 Ill. 338; *People v. Cooper* (1947), 398 Ill. 468; Annot., 95 A.L.R.2d 351 (1964); 75 Am. Jur. 2d *Trial* sec. 991 (1974); 58 Am. Jur. 2d *New Trial* sec. 93 (1971).) In *Wallenberg,* the defendant's alibi included a statement that there were no gas stations on a certain road. In commenting on the testimony, the trial judge stated that he knew from his own private knowledge that there were gas stations on the road in question. The conviction was reversed on the ground that the trial court had relied on private knowledge rather than facts in evidence. In *Thunberg,* the trial court read a confession not in evidence and conducted a private interview of the prosecuting witness and her parents. Likewise in *Rivers,* the trial court's recorded statements clearly indicated that he had considered matters *dehors* the record. The trial judge in *McMiller* specifically referred to the fact that he had made a private investigation to find out personal information about the defendant. In *Cooper,* the record showed that the trial judge had not only explored the background of certain of the defendant's character witnesses by reference to other cases in which he had seen and heard them testify but that he had also conducted a private view of the scene of the crime. While it is apparent that in the foregoing cases the record affirmatively established that the trier of fact had considered matters not properly in evidence, that

is not true here.

We do not agree that the shotgun itself could not have assisted the court in reaching its decision or that the trial judge's remarks show that he conducted an improper test or experiment with the gun. In view of the defendant's demonstration of the manner in which the gun was handled during the shooting incident, we believe that examination of the gun itself could properly assist the judge during his deliberation. We also note that there was no evidence during trial as to whether the gun had to be cocked for it to fire but that this matter was nevertheless brought up by counsel in closing argument. In this context, it appears that the remarks of the trial judge regarding the gun were intended to make it clear that the gun's mechanical operation had no bearing upon his decision. In other words, that irrespective of the mechanical functioning of the gun, he did not believe that the shooting could have occurred in the manner described by the defendant in view of the totality of the evidence, including the manner in which the gun was being carried by the deceased, the length and other physical characteristics of the gun and the angle and location of the wound.

At most, the trial judge's remarks can properly be construed as indicating only that he may have examined the gun both in a cocked and uncocked condition. We do not find this to be objectionable. Additionally, we note that the defendant does not suggest in what manner the gun was tested by the trial judge but instead speculates that there must have been some impermissible experiment. We will not indulge in such speculation or presumption of impropriety on the part of the trial judge. We conclude that there is nothing in the record to rebut the presumption that the trial judge considered only competent evidence in reaching his verdict.

The sole issue briefed and argued on this appeal is whether the record established that the trial judge had

conducted an improper test of the gun. The defendant raised other issues in his appeal to the appellate court which that court did not deem it necessary to fully consider in view of its holding. We therefore remand the cause to the appellate court for consideration of those other issues.

Accordingly, the judgment of the appellate court is reversed and the cause is remanded to that court for consideration of the remaining issues.

*Reversed and remanded.*