THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JOHN LOFTHOUSE, Defendant-Appellant.

First District (4th Division)    No. 63078

Opinion filed March 23, 1978.

James J. Doherty, Public Defender, of Chicago (Aaron L. Meyers, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, James S. Veldman, and James A. Hullihan, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE ROMITI delivered the opinion of the court:

Early on the morning of November 10, 1973, John Lofthouse, defendant, fired shots which killed Manuel Ramirez and injured Edson Montanez while they were seated in a car with Miguel Mendez and Josea Lopez. Defendant was charged with the murder of Ramirez, aggravated battery as to Montanez, and attempt to commit murder as to Mendez and Lopez. Following a bench trial defendant was convicted of voluntary manslaughter and aggravated battery and for those respective crimes was sentenced to concurrent terms of six to 18 years and three to 10 years. On appeal defendant contends: (1) the State did not prove beyond a reasonable doubt that he did not act in self-defense; (2) the trial judge incorrectly stated and applied the law of voluntary manslaughter; (3) the trial judge erred in not granting a mistrial following an improper question asked of the defendant by the State; (4) defendant's sentence for voluntary manslaughter should be reduced.

We affirm defendant's convictions and sentences.

Montanez, Mendez and Lopez testified for the State, giving the following account of the incident: On November 10, 1973, at about 1:30 a.m. they were seated in a car at a housing project parking lot at 25th and Washtenaw in Chicago. They had driven there in order to visit Edwin Galetti, who lived in the area. Montanez was in the driver's seat, Ramirez was next to him, and Mendez and Lopez were in the back seat. Minutes after they arrived, defendant approached the passenger side, opened the door, and pointed a sawed-off shotgun at them. He asked them what they were doing there, saying that they did not belong in Latin Count territory. In additional references to youth gangs, defendant asked them whom they represented and accused them of being members of the Latin Kings. When defendant was told that they belonged to no gangs and had come to visit Galetti, he began to talk about how Galetti had taken his girlfriend from him and had "given her a baby." The occupants of the car sought to calm him, but defendant fired his gun into the air and then, according to Mendez, said it would be that easy to kill them. Ron Tatro was with the defendant and attempted to get him to leave, but to no avail. Mendez asked defendant if they could leave and come back later. Defendant responded by stating he would see them later but then fired three times into the car. The first shot just missed Mendez' head, blowing his hat off; the second shot struck Ramirez in the head, and the third shot struck Montanez in the elbow. Defendant then ran from the car. The three witnesses testified that they had no guns in the car, had not shot at the defendant earlier that day and had not been in the lot earlier that day. They denied being members of the Latin Kings, admitting only having been members of the Counts which they said was not a gang and was not related to the Latin Kings.

Investigator John Dahlberg testified that after defendant was arrested

he gave an oral statement concerning the shooting. In that statement defendant said that earlier in the evening a car in which Ramirez was a passenger came to the project complex. Defendant asked the occupants if they were looking for trouble. About an hour later the car returned. Defendant got a shotgun, walked to the passenger side of the car, and opened the door. Ramirez, who was seated on the passenger side, opened his coat and showed defendant a handgun concealed in his waistband. Defendant then fired three shots into the car and fled. Dahlberg further testified that defendant did not tell him that he had been threatened earlier by the occupants of the car, nor did he say that Ramirez ever took the gun out of his waistband.

Defendant testified that at about 11:30 or 12 that evening he left a party in one of the project apartments. As he began to cross a basketball court he saw Ramirez, Montanez, Mendez and Lopez. Montanez and Ramirez approached Edwin Galetti's door and began to bang on it. At that point someone threw a bottle and defendant turned to see who threw it. Ramirez then yelled something and fired two shots in the air in defendant's direction. Defendant took cover along with two girls who were there, Debbie Osinger and Carolyn Hills. Defendant next heard a car drive off and noticed that the four were gone. Defendant returned to the party but later at about 1 a.m. again left with Debbie Osinger to get a beer. On their way back to the party defendant saw Montanez' car again. He walked up to the car and as he did so Ron Tatro, who had also been at the party, walked up behind him and handed him a shotgun. Defendant opened the door of the car and asked the occupants (the same four as established by the State's evidence) why they were shooting at him. He also asked them whether a girl named Wendy had been raped by one of their friends. When they laughed at this question he told them to shut up and fired the gun into the air. Defendant told them he could shoot them but he wanted to talk. Ramirez pulled out a revolver and started pointing it at the defendant, who then shot him. When Montanez picked up the revolver defendant shot him too. Lopez grabbed the defendant's gun and when defendant pulled it back it fired. Defendant fled, noticing as he did that David Worth was also at the scene.

Defendant presented several witnesses in an effort to establish that the occupants of the car were armed. Patricia Osinger testified that during the afternoon after the shooting, at about 5 p.m., Mendez and Lopez came to the parking lot and picked up an object from a vent. Delores Murphy saw Mendez and Lopez there at the same time but said they were with three others. One of those five picked up a gun. Carolyn Hills said she witnessed the shooting and afterward saw Mendez and Lopez hide something by a vent located there. Later at about 5 p.m. they returned and retrieved two guns from the area. David Worth said that after the

shots were fired he approached the car and saw a gun on the back seat between Lopez and Mendez. Lopez and Mendez in their testimony admitted they returned to the area that afternoon, but only to look for Mendez' keys.

Four other witnesses testified that they were present at the time of the shooting. David Worth testified that at about 1 a.m. he was walking home through the parking lot when he saw defendant talking to the occupants of a car, including Mendez and Lopez. He saw defendant shoot in the air and then heard four more shots but did not see who fired them. Ron Tatro said defendant walked out of the party with the shotgun and he followed. He saw defendant approach the car, open the door and talk to the occupants. Defendant fired a shot into the air and Tatro tried to convince him to give up the gun. As Tatro left he heard one or more other shots but he did not identify who fired them. Tatro denied seeing a gun in the car or telling anyone he did so. Worth and Tatro were called as defense witnesses but Tatro was declared a court's witness during his testimony. As an impeachment witness the defense called Cary Polikoff, the brother of one of the defense attorneys. Polikoff testified that he was present when Tatro was interviewed by his brother and at that time Tatro said he could see a gun in the trousers of the person in the right front seat of the car. A third witness called for the defense, Carolyn Hills, recalled that at about 12:30 that night at the parking lot a car pulled up with Mendez, Lopez, Ramirez and Montanez in it. They yelled "King Love" and defendant yelled back "Count Love." Those in the car then began shooting at defendant. Defendant left and returned in a few minutes with a gun and began firing back from about 25 feet away from the car. She said defendant never had a conversation with the occupants of the car and never came closer to it than 25 feet. Debbie Osinger, called as a court's witness, testified she was defendant's girlfriend at the time of the incident although not at the time of trial. At 11:30 that night she was standing with defendant in the area of the parking lot when shots were fired. She did not see who fired the shots. She took cover, observing as she did so that Ron Tatro handed defendant a gun. She then heard three shots fired but did not see who fired them.

In making its findings the court stated:

"Based upon all testimony the Court might just relate to you that it did believe that the most honest witness it saw on the stand was Delores Murphy, I believe her name was and I thought she was very sincere and honest in her statements and told the truth as she saw it. And I think that much of this might have been substantiated by some of the other witnesses, Patty Osinger, 14-year-old girl who the Court also thought was very sincere and honest in her testimony and although Carolyn Hills may have stretched a lot of

her testimony, I think that generally speaking what she said was substantiated by the other witnesses, Patty Osinger, as well as Delores Murphy in that there was a gun that was located and found based upon finding this gun, it would lead one to suspect that there were shots as testified to that were fired previous to the time of the incident where the defendant shot and killed the victim in this case. His apprehension of perhaps taking the matter into his own hands was unreasonable and I believe that our law has repeatedly held that where a person while acting under an unreasonable belief that deadly force is necessary to protect himself from imminent death or great bodily harm, that that would constitute voluntary manslaughter. And I believe in this case that when he thought that these shots may have been fired at him and, of course, Debbie Osinger said that the shots were coming in that direction that she heard, she thought that they were coming in that direction that this defendant thought that they were being fired upon him and instead of perhaps seeking help from the police or going to the local authorities, he decided to take the matter into his own hands and that was an unreasonable belief an unreasonable belief under the law does not or would constitute voluntary manslaughter and not murder."

I.

The Illinois statute on voluntary manslaughter provides in pertinent part:

"A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable." (Ill. Rev. Stat. 1973, ch. 38, par. 9—2(b).)

Article 7—1 provides a limitation:

"* * * [A person] is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." Ill. Rev. Stat. 1973, ch. 38, par. 7—1.

■ ■ ■ The evidence presented at trial, which we have summarized, provided a sufficient basis for a finding of voluntary manslaughter. The trial court's comments on this evidence are compatible with such a finding. Those comments establish only that the judge believed the occupants of the car had fired at the defendant at a time prior to the time when defendant shot Ramirez. This does not establish that the judge

believed defendant's testimony that a gun was pulled on him after he approached the car. No witnesses other than the defendant testified to this. Indeed, his testimony that he held a shotgun pointed at the occupants of the car from the time he approached it makes it unlikely that such an attempt was made, even assuming, as defendant does on appeal, that the trial court's findings tend to show that the occupants were armed. The trial judge may have believed what Investigator Dahlberg reported as defendant's earlier version of the incident: that Ramirez was armed but did not draw his weapon. Such a finding would support defendant's conviction for voluntary manslaughter. However, our determination is not based on speculation as to what the trial court's full conclusions of fact were; rather we judge that there was sufficient evidence presented at trial to support his ultimate finding, even when those limited factual conclusions he articulated are considered.

We are also not persuaded by defendant's contention that the trial judge's comments indicate an incorrect conception and application of the law of voluntary manslaughter. As our supreme court has stated:

> "* * * the fact that a trial judge does not find a defendant guilty of murder does not mean that those circumstances that might have been taken to show premeditation and malice must be disregarded in determining the reasonableness of the defendant's belief that deadly force was necessary in order to protect himself from imminent death or great bodily harm." (*People v. Schwartz* (1974), 58 Ill. 2d 274, 277, 319 N.E.2d 23, 25.)

Here defendant's own testimony indicated that he chose to approach people who had shot at him earlier in the evening. Defendant did so holding a loaded shotgun pointed at those occupants. These events, to which the trial court alluded in the statement we have quoted, were properly considered in determining the reasonableness of defendant's belief in the necessity of using deadly force at that time. Nor does consideration of these factors suggest that evidence concerning the events immediately preceding the shooting was not considered by the trial judge.

## II.

Defendant also contends that the trial court erred in not granting his motion for a mistrial because of a question asked of him by the State. The question concerned a letter which defendant had written to a friend of his, Charlie Nova. Prior to trial the State, pursuant to discovery, disclosed the existence and contents of the letter to the defendant. During cross-examination of the defendant the State attempted to question him about the letter. Defense counsel objected and sought an immediate hearing on a motion to suppress the letter and any use of it on the grounds of illegal

seizure. The court indicated that it could not rule on the matter until the State actually attempted to introduce the letter into evidence. After extended colloquy the judge ruled that defendant could "* * * merely be questioned whether or not he recognizes the instrument and then that is it." The Assistant State's Attorney then asked the following:

"Q. Mr. Lofthouse, I believe the last question I asked you before we took a break was, did you ever write a letter to Charlie Nova?

A: Yes

Q: And while you were in the County Jail?

A: Yes

Q: And did you ever write letters to anybody else while in the County Jail

Mr. Belkind: Objection. We just had a side-bar about this.

Mr. Ginex: I will withdraw it.

The Court: Sustained

Mr. Ginex: Did you ever write to Charlie Nova and say to him that you committed murder?"

The trial court denied defendant's motion for a mistrial because of this question but did sustain his objection to it and ultimately struck all references to Charlie Nova contained in the cross-examination of the defendant.

■■ While ordinarily defendant's failure to raise this issue in his written motion for a new trial would constitute a waiver of the issue on appeal (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856), we note that the matter was brought to the attention of the trial court when defendant moved for a mistrial and therefore we will consider the issue on its merits. *People v. Nunez* (1974), 24 Ill. App. 3d 163, 320 N.E.2d 462; *People v. Gray* (1977), 47 Ill. App. 3d 1026, 365 N.E.2d 501.

■■ Because this was a bench trial we have available to us the presumption that a trial judge presiding in a bench trial considers only evidence properly before the court. (*People v. Gilbert* (1977), 68 Ill. 2d 252, 369 N.E.2d 849; *People v. Delno* (1966), 35 Ill. 2d 159, 220 N.E.2d 190; *People v. Woods* (1976), 41 Ill. App. 3d 29, 353 N.E.2d 304.) But here we need not utilize the presumption, as the record establishes that the trial judge sustained defendant's objection to the question and further struck all references to Charlie Nova in that portion of the testimony. We believe this affirmatively establishes that the trial court did not consider the matter in its deliberations and therefore conclude that defendant has not established any prejudice.

■■ Defendant's sentences were within the statutory periods allowed by law. He had previously been convicted of unlawful use of weapons, burglary, and theft. His actions established in this cause resulted in the death of one man and injury to another. In sentencing the defendant the trial court indicated that it had considered the question of defendant's

ultimate rehabilitation. We find no abuse of discretion in the sentences and therefore affirm them.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

JOHNSON, P. J., and LINN, J., concur.