THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WILLIAM GASNER, Defendant-Appellant.

First District (5th Division)   No. 78-1856

Opinion filed December 28, 1979.

Norman Nelson, Jr., of Chicago (Ray Sabransky, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Iris E. Sholder, and James L. Alexander, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Defendant was charged by indictment with two counts of indecent liberties with a child. (Ill. Rev. Stat. 1975, ch. 38, par. 11—4.) Following a bench trial, defendant was found guilty of contributing to the sexual delinquency of a child (Ill. Rev. Stat. 1975, ch. 38, par. 11—5) and was sentenced to a term of 364 days. On appeal, defendant contends that: (1) evidence of prior gifts from defendant to the child and statements from which prior crimes could be inferred were improperly admitted at trial; and (2) his guilt was not proved beyond a reasonable doubt. We affirm. The following pertinent evidence was adduced at trial.

*For the State*

Leslie, the child, testified that defendant had been his eighth-grade homeroom teacher. In November 1976, the eighth-grade students went on a field trip. On the return trip, defendant stopped the bus and took Leslie to his apartment while the other students waited on the bus. Defendant showed Leslie his bedroom, which was blue with clouds painted on the walls and noted that when he wakes up it is like waking up in heaven. After five to 10 minutes, they left and returned to school.

In January 1977 defendant invited Leslie to his apartment because his wife was ill and he had nothing to do. Leslie asked if he could bring two friends and defendant agreed. He and his two friends went to the apartment where defendant and several of his friends, Tim, Linda and Jeff, were also present. They listened to music and smoked marijuana.

The following week defendant invited Leslie to "come over and party." He and one friend joined defendant, Linda and Jeff in drinking, smoking marijuana, and listening to music. After his visit, Leslie made weekly visits to defendant's apartment, accompanied by a friend. Defendant began writing letters and cards to Leslie which were identified at trial and delivered them either in class or at his apartment. Leslie also identified his graduation autograph book which contained a note from defendant. Defendant gave Leslie a number of gifts including a bicycle, a

watch, rings, a wooden chest, a clock, a shirt and jeans, and a bag for his bicycle which he identified at trial. The letters, cards and other gifts were admitted into evidence over defendant's objection.

In May 1977 defendant began to talk about "love and stuff like that." Leslie began going to defendant's apartment twice weekly, sometimes alone. Defendant began to put his arm around him and to talk about love more often. In June he visited defendant two or three times weekly, usually by himself.

On June 26, 1977, Leslie went to defendant's apartment alone at about 7 p.m. Jeff and Linda were also there. They all smoked marijuana and drank tequila until about 9 p.m. At that time defendant led Leslie to his bedroom, closed the door, and the two disrobed. Leslie described the two acts for which defendant was indicted. Afterwards, they each showered separately. They then went to the kitchen where defendant gave him vitamins and they returned to the front room. Leslie left the apartment at about 10 p.m.

On June 29 Leslie told his mother that he did not want to live with her. He also told defendant that he would commit suicide if he were unable to be with defendant. Defendant met with Leslie's mother and the two argued. After the argument, Leslie spent the night at defendant's apartment. The next day police took Leslie to a police station.

On cross-examination Leslie stated that when he arrived at defendant's apartment on June 26, Linda was in her room while Jeff was in the front room. On June 28, he told his mother and several police officers that he and defendant had had sexual relations.

Leslie's mother testified that she first met defendant in November 1976 at an open house and again in February 1977 at the grammar school. On about June 10, 1977, she called defendant and they met at the Niagara Club at about 10 p.m. Defendant told her that he loved Leslie and that he wanted Leslie to come and live with him since he could do more for him than she could. He stated that he wanted to share his home with Leslie for the rest of his life and admitted that they had a sexual relationship. She replied that Leslie had told her about the relationship. Defendant stated that in the future men would love men and women would love women and that his wife understood this. In fact, his wife was waiting to meet a woman with whom she could have a relationship. Following the conversation Leslie's mother went home.

On June 29 at about 10 p.m. she received a phone call from defendant, and defendant and her son picked her up about 20 minutes later. Defendant told her that her son no longer cared to live with her because she was destructive and did not understand. Defendant also told her that she was no good for her son. After she called defendant a "pervert," he slapped her and pushed her into her apartment building.

The argument continued until defendant said that there was no sense in talking to her and left with Leslie. Her son did not return home that night.

The following day she went to the police. She gave the police certain letters, an autograph book, and other items which she found in her son's bedroom. She identified these items at trial. Later, on July 7, she brought additional items to the police including a clock, rings, a shirt and a pair of jeans, a watch, and a bikepack. She also identified these at trial and they were admitted into evidence. She stated that she did not go to the police immediately after the conversation on June 10 because her son had told her that he would kill himself if she did anything to break up himself and defendant.

Chicago police officer Byrne testified that on June 30, 1977, after speaking with Leslie's mother, he arrested defendant at his apartment building. At the time of his arrest, defendant was accompanied by his wife and Leslie. He brought defendant to the police station and returned Leslie to his mother.

Assistant State's Attorney Kaplan testified that on July 1, 1977, at about 2 a.m. he spoke with defendant at a police station. He inquired about the relationship between defendant and Leslie. Defendant replied that they were very close, that they loved each other very much, and that the relationship had intensified in recent months. When asked how they demonstrated their love for each other, defendant replied, "You wouldn't understand" and "We just love each other very much." When Kaplan asked him to describe the actual relationship, defendant began to cry. Defendant never admitted to Kaplan that he had a physical relationship with Leslie.

*For the Defense*

Jeff Granger testified that on June 26, 1977, he lived with defendant, defendant's wife, Janet, and a friend, Linda. At about 6:30 p.m. on that date, they were at home when their real estate agent and the representative for the buyer came over to discuss negotiations for the sale of the apartment. The agents left between 7:30 and 8 p.m. and Granger was absent from the apartment between that time while he walked the dog. When Granger returned, Leslie was talking to defendant's wife in Granger's room. Later, he spoke with him in the kitchen. Defendant and his wife were also present, preparing dinner, and they discussed the sale of the apartment. Dinner was finished at about 10 p.m. and they took Leslie home at about 10:20 p.m.

Granger stated that during that evening defendant and Leslie never left his presence or went to defendant's bedroom. He never saw any indecent acts during that evening. He further stated that no one smoked marijuana or drank tequila that evening. The only alcohol consumed was

some wine which a friend named Alice brought at about 10 p.m. to celebrate the sale of the apartment. Granger said that he had been out socially with Leslie, defendant and his wife in the past.

On cross-examination Granger testified that he had known defendant for five years and had lived with him for a period of between four and five years. Two other men also lived with them temporarily. Later, defendant married and Granger continued to live with the couple. The witness described the living arrangement as a cooperative.

Granger first met Leslie in April 1977. Sometimes he would come to the apartment alone, and sometimes he would come with someone else. They would all talk about school, home, and daily encounters. They also spoke about philosophy, interpersonal relationships, love, how to express emotion, and changing lifestyles.

Granger testified that on June 26 when he returned from walking the dog he went to the kitchen and could hear defendant, his wife and Leslie talking in his own room. Granger described his feelings for defendant as those of a brother and stated that defendant had expressed his love for him in a brotherly way.

Janet Gasner, defendant's wife, testified that on June 26, 1977, at about 6:30 p.m., defendant, Jeff, Linda and she, as well as two real estate agents, were in the apartment. Leslie entered shortly thereafter. She took him into Jeff's room where she talked with him. Defendant spoke with the real estate agents in another room. About an hour later, the agents left and defendant joined the two in Jeff's room for about half an hour. At about 8:15 p.m. they all entered the kitchen and joined Jeff who had been studying there. She prepared dinner and they ate at about 9:30 p.m. Leslie and defendant were there the entire time. After dinner, a friend named Alice arrived with cheese and wine to celebrate the sale of the apartment. At about 10:15 p.m. defendant, Jeff and she took Leslie home.

She stated that she had never seen defendant, Jeff and Leslie smoke marijuana or drink tequila. On the night in question defendant never left her presence or left with Leslie. Leslie was in her presence during his entire visit. She also recounted various gifts which she and defendant gave Leslie because they felt sorry for him. On cross-examination she stated that the rings and bicycle given to him belonged to defendant and that defendant usually added her name to Leslie's cards as he did on a graduation card which had been admitted into evidence. She never assisted defendant in composing any letters to him.

Defendant's real estate agent testified that on June 26, 1977, she went to defendant's apartment at about 6:30 p.m. and stayed for about an hour. While she was there someone entered the apartment and went to the back room but she could not recall who it was. On cross-examination she stated

that she glanced at the person for a second and remembered only that he was a male.

Defendant testified in his own behalf. On June 26, 1977, his wife, Jeff and he went to the beach. They returned to his apartment at about 4:30 p.m. Real estate agents came at 6:30 p.m. and he spoke with them in the living room for about an hour. During that time Leslie arrived and went into the den with defendant's wife. Jeff was studying in the kitchen. The agents left at about 7:45 p.m. and he went to the den to talk to his wife and Leslie about the sale of the apartment. They all went to the kitchen and talked to Jeff. Defendant's wife prepared dinner and they remained in the kitchen until after dinner. At about 10 p.m. a friend named Alice arrived with wine and cheese to celebrate the sale of the apartment. At about 10:15 p.m. Jeff, defendant and his wife took Leslie home. Defendant denied going into a bedroom alone with Leslie or having any sexual acts with him. He stated that his wife was with him from 7:45 p.m. until the end of the night.

On cross-examination defendant stated that he had a love for Leslie which he manifested by being responsive to his needs. He identified several of the trial exhibits as cards he had given to Leslie or which he had requested. He believed that their relationship was based on "growth, understanding, trust, joy." Defendant admitted telling him that he would love him beyond his (defendant's) mortal life and eternity because "that's the way true love operates." The first time Leslie was in defendant's apartment was on the return from a school field trip when he helped to carry papers and to pick up some music from the apartment.

Defendant stated that because Leslie was unhappy at home and wanted to leave he agreed to let him stay at his apartment. On June 28, 1977, he called Leslie's mother and told her that her son was in hysterics at his apartment and had told him that he would rather die than go home. Later that night he and Leslie met the mother and defendant told her that her son was welcome in his home. He denied meeting the mother on June 10 or June 11.

Defendant denied smoking marijuana on June 26 but admitted that he had used it in the past. When asked if he had ever expressed his views on homosexuality to Leslie, defendant replied that Leslie had expressed a desire for homosexual relations and he told Leslie that he should not be "self-deprecating" because of those feelings.

Defendant was 39 years old and Leslie 14 years old at the time of the alleged offense.

Following arguments, defendant was found guilty of contributing to the sexual delinquency of a child and judgment was entered on that finding. This appeal followed.

OPINION

Defendant contends that the trial court erred in admitting the gifts, notes, and letters which he gave to Leslie and testimony concerning prior acts or relationships which could be considered as evidence of prior crimes. He also asserts that the prosecutor's cross-examination of Jeff Granger improperly suggested that there was a sexual basis for their cohabitation.

■■ Defendant complains of the testimony of Leslie's mother regarding their June 10 conversation in which defendant allegedly admitted that he had a sexual relationship with Leslie. He asserts that this testimony should have been excluded since it was evidence from which one could infer the existence of prior crimes. The testimony was properly admitted for the reasons set forth in *People v. Kraus* (1946), 395 Ill. 233, 69 N.E.2d 885. There the court stated:

> "The general rule is that proof of other acts is inadmissible unless they are a part of the *res gestae*. But an exception, as well established as the rule, is, that in the trial of a defendant for the commission of a crime involving sex relations, evidence of prior offenses between the defendant and the complaining witness is admissible for the purpose of showing the relation of the parties and to corroborate the testimony of the complaining witness concerning the particular act. * * *. The evidence of [the victim] as to other illicit acts was admissible, not for the purpose of showing an offense other than the one charged, but to show the relation and familiarity that existed between plaintiff in error and the boy." 395 Ill. 233, 237.

■■ The admission of similar testimony has been held to be proper to establish the relationship between the parties in *People v. Wendt* (1968), 104 Ill. App. 2d 192, 244 N.E.2d 384; *People v. Long* (1977), 55 Ill. App. 3d 764, 370 N.E.2d 1315; *People v. Krison* (1978), 63 Ill. App. 3d 531, 380 N.E.2d 449; and *People v. Arbuckle* (1979), 75 Ill. App. 3d 826, 393 N.E.2d 1296. On the basis of the foregoing authority, we conclude that the testimony was properly admitted to establish the relation between defendant and Leslie and to corroborate Leslie's testimony.

Defendant also complains about the admission into evidence of the gifts, notes and cards which he gave to Leslie. He asserts that the exhibits were evidence of "the day to day innocent acts between the defendant and [Leslie]" and were irrelevant to the issue of whether defendant committed the alleged crimes. He submits that "[a] man should not be convicted of a crime merely because he has a different lifestyle, or has given gifts or notes to a person, even if this person is a young man." It is unnecessary to set out the tests of the various exhibits introduced at trial.

As a whole, they expressed defendant's intimate and romantic feelings for Leslie.

■■ Contrary to defendant's assertion, he was not convicted of having a different lifestyle or for sending letters and gifts, but for the deviate sexual acts which he performed with a child. The exhibits were relevant to show the relation of the parties, their familiarity, and to corroborate Leslie's testimony regarding the affection defendant exhibited toward him. In *People v. Gray* (1911), 251 Ill. 431, 96 N.E. 268, a rape case, the court ruled that two unsigned postcards which defendant had sent to the complainant were admissible to show the relation of the parties. Besides the handwritten addresses, one of the postcards contained the words "Something coming." In *Gray*, the cards merely established that defendant knew the complainant and would not be probative of the nature of their relationship. In the instant case, the exhibits more clearly established the nature of the relationship between the two and would therefore be of greater probative value in that regard than were the postcards in *Gray*.

A more recent analogy is provided by *People v. Krison* (1978), 63 Ill. App. 3d 531, 380 N.E.2d 449, another indecent liberties case. There, group exhibits consisting of lewd photographs, some of which had been shown to one of the children, and others taken of one of the children, were introduced at trial. Defendant contended the photographs were evidence of other criminal acts and should have been excluded. The appellate court ruled that the exhibits were properly admitted to show the relationship of the parties and the intent with which the act charged was done. It was further noted that:

> "* * * The conduct charged was not an isolated incident. The trier-of-fact was entitled to view the testimony of the incident within the context of the actual relationship between defendant and the complainants. To hold otherwise would place an unfair strain upon the credibility of the complainants' testimony concerning the charged offense. * * *." 63 Ill. App. 3d 531, 535-36.

Similarly, in this case, the acts complained of would be more difficult to establish and their occurrence more subject to question if viewed in isolation than if viewed in the broader context of the actual relationship. When the cards, letters and gifts are considered, a familiarity which would be conducive to the particular acts is established by which the credibility of the witnesses could be assessed more accurately.

In *People v. Wendt* (1968), 104 Ill. App. 2d 192, 244 N.E.2d 384, a case very similar to the instant one, the defendant was also charged with indecent liberties with a child. The complainant's testimony that defendant struck him with a belt and board about his legs and rear end was

held admissible to show the relationship and familiarity between the two parties, although the paddling was not a crime nor directly related to the crime charged. Likewise, the letters, cards and gifts were properly admitted for the same purpose in this case.

Defendant also contends that the prosecutor's cross-examination of Jeff Granger improperly suggested that there was a sexual basis for his living with defendant. Although defendant does not direct our attention to any specific questions, we find that at the end of Granger's cross-examination, the following exchange took place:

"[Prosecutor]: Do you love Mr. Gasner?

MR. NELSON [Defense counsel]: Objection, Judge.

THE COURT: I will sustain the objection.

MR. SCHLESINGER [Prosecutor]: Could you describe for the Court your feeling towards Mr. Gasner?

A. He is like a brother to me.

Q. Kind of a brotherly relationship?

A. Yes.

Q. Has he ever expressed his love for you?

A. In a brotherly sense, yes.

Q. How has he done that? How has he expressed that brother relationship?

MR. NELSON [Defense counsel]: Objection, Judge.

THE COURT: Sustained.

MR. SCHLESINGER [Prosecutor]: Q. Has he ever communicated with you in writing his love for you?

A. No."

■ Defendant concedes that his objections to the questions were sustained, but contends that the questions were so inflammatory that they created a "climate greatly prejudicial to defendant." We do not agree. Whatever the nature of the relationship between defendant and Granger was, it would be irrelevant to the issue before the court. The court properly sustained the defense objections and precluded further examination along those lines.

It is presumed that in a bench trial a trial court considered only competent evidence in reaching its determination (*People v. Gilbert* (1977), 68 Ill. 2d 252, 369 N.E.2d 849; *People v. Berland* (1978), 74 Ill. 2d 286, 385 N.E.2d 649), but this presumption may be rebutted where the record affirmatively shows the contrary. (*People v. Gilbert.*) No evidence of a homosexual relationship between defendant and Granger was presented at trial, nor does the record reveal that the trial court considered such an inference in reaching its determination. The isolated questioning did not create a "climate greatly prejudicial to defendant" and we find this contention to be without merit.

Defendant contends that he was not proved guilty beyond a reasonable doubt since the testimony of Leslie was uncorroborated and contradicted by other witnesses who established that defendant and Leslie were not alone on the night in question.

Where a conviction for taking indecent liberties with a child is based upon the testimony of the child, the testimony must be substantially corroborated or be clear and convincing to sustain the conviction. (*People v. Morgan* (1977), 69 Ill. 2d 200, 370 N.E.2d 1063; *People v. Taylor* (1978), 64 Ill. App. 3d 279, 381 N.E.2d 303.) Since the testimony of all the witnesses established that Leslie and defendant were present in the apartment, the only question was whether they were alone in defendant's bedroom at about 9 p.m. when the acts allegedly occurred. This was simply a question of credibility of the witnesses. Leslie's testimony was very straightforward and we find it to be clear and convincing as to what occurred on the night in question. In addition, his testimony was substantially corroborated by the cards, letters and gifts, by his mother's testimony, and by the defendant himself.

The cards and letters clearly showed that defendant had a strong regard for Leslie, beyond the usual student-teacher relationship. His mother testified about her meeting with defendant on June 10 wherein he admitted he loved Leslie and wanted him to live with defendant. She also testified that defendant admitted that he had had sex with him and stated that Leslie had threatened to commit suicide if she tried to break them up. Finally, defendant admitted at trial that he loved Leslie. In addition, Assistant State's Attorney Kaplan testified that defendant admitted that the relationship had intensified over the months prior to the incident. As the trial court correctly stated, these factors corroborated Leslie's clear and convincing testimony and established defendant's guilt.

As noted earlier, the determination of guilt or innocence in this case turns on questions involving the weight accorded to the evidence and the credibility of the witnesses. A reviewing court will not substitute its judgment on these matters and reverse a conviction unless the evidence is so improbable as to raise a reasonable doubt of defendant's guilt. (*People v. Berland* (1978), 74 Ill. 2d 286, 385 N.E.2d 649; *People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631.) The trial court was in a position to observe the witnesses and believed Leslie's version of the events. A review of the record does not show that the evidence is so improbable as to raise a reasonable doubt of defendant's guilt.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

SULLIVAN, P. J., and WILSON, J., concur.