2024 IL App (1st) 221073-U

1-22-1073

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 11136 |
| | ) | |
| KAVONTE CALDWELL, | ) | |
| | ) | Honorable Steven Jay |
| Petitioner-Appellant. | ) | Rosenblum, Judge Presiding. |

_____

JUSTICE TAILOR delivered the judgment of the court.
Justice Hyman concurred in the judgment.
Presiding Justice Oden Johnson dissented.

**ORDER**

¶ 1   *Held*:  Defendant was proven guilty beyond a reasonable doubt.  The trial court did not rely on improper personal knowledge in finding defendant guilty.

¶ 2   Following a bench trial, defendant Kavonte Caldwell, was convicted of three counts of

aggravated battery with a firearm and sentenced to 21 years' imprisonment. On appeal, Caldwell argues: (1) that the State failed to prove him guilty beyond a reasonable doubt; and (2) he was denied a fair trial when the trial judge relied on his own personal knowledge of ballistics in finding him guilty. For the following reasons, we affirm the judgment of the trial court.

¶ 3                                    BACKGROUND

¶ 4      At trial, Nedir Mohammad testified that he was 24 years old. On May 9, 2019, he was trying to sell an iPhone and posted the phone for sale on his Snapchat story. Caldwell responded to the post and expressed interest in buying the phone. Nedir knew Caldwell because they attended the same high school and had class together. During that time, Nedir saw Caldwell almost daily and considered him a friend. Nedir and Caldwell remained in contact through social media after graduating.

¶ 5      Nedir agreed to sell Caldwell the phone and they agreed to meet at Kavonte's apartment in Justice, Illinois. Prior to going to that location, Nedir went to his friend Tayseer's home. When he got there, Tayseer was there with a young woman that Nedir had never met before named R.H.. The three of them drove to meet Caldwell in Tayseer's four-door Toyota. Tayseer was the driver, Nedir sat in the front passenger seat, and R.H. sat in the rear passenger seat. They arrived around 5:30 or 6:00 p.m. and Nedir parked near the entrance of an apartment complex. Nedir spotted Caldwell and waved him over. Caldwell entered the car and sat in the back seat behind Tayseer.

¶ 6      Nedir testified that they were chatting and catching up and Nedir handed Caldwell the phone so he could check it out. Using his own phone, Caldwell turned the flash on and either took a picture or a video of the phone. He then returned the phone to Nedir and then told him he needed to get his money. They offered to drive Caldwell closer to his apartment to get the money

and Caldwell led them to a parking spot near his car. Caldwell got out of the car and entered an apartment building. Caldwell returned about a minute later and reentered the rear driver's side seat of Tayseer's car.

¶ 7    Nedir turned around and handed Caldwell the phone. Nedir then saw sparks, bullets, fire and smoke. Nedir could feel his body being hit by bullets coming from a gun in Caldwell's right hand. The first three shots hit Nedir in the chin, neck and chest. Nedir saw Caldwell look at R.H., point the gun at her face and fire. Caldwell then looked at Tayseer and shot him in the back. Caldwell then looked back at Nedir and shot him again, hitting him in the left shoulder. Nedir tried to protect himself by putting his right arm over his face. As Nedir was trying to get out of the car, Caldwell shot him again in his right tricep. Nedir testified that as he turned to get out of the car he felt pressure on his shoulder, which he believed was the barrel of the gun touching his body just before he felt the sting of another bullet. Nedir was shot three or four more times in the back and, as he was halfway out of the car, he was shot once in the leg.

¶ 8    When he was finally able to run away, Nedir could see Tayseer trying to get out of the car.  Caldwell ran back to the same location he had come from earlier. Nedir ran toward the police station and saw that R.H. was in front of him. They heard the police and ambulances arrive and walked back to the scene. Nedir was taken to Christ Hospital where he underwent surgery. Nedir testified he suffered 11 bullet wounds and two graze wounds.

¶ 9    On May 10, 2019, he viewed a photo array and identified Caldwell as the person who shot and tried to kill him.  On cross-examination, Nedir denied knowing that Caldwell worked at United Parcel Service and denied driving Caldwell home ever, let alone nightly. Nedir further denied selling Caldwell cannabis. He denied the duffel bag in Tayseer's car was his and denied previously being in Caldwell's apartment complex. Nedir stated that he knew Tayseer had a

concealed carry license but did not know Tayseer was armed that day or that there was ammunition in the glove compartment.

¶ 10    Tayseer Hamdan testified that he was 28 years old and was the retail district manager at a cellular store where he had worked for the past six years. Tayseer and Nedir met several years earlier when they both worked at a T-Mobile store. On May 9, 2019, it was Ramadan and he and Nedir had plans to go to dinner at a steakhouse.  Before Nedir arrived at his apartment, Tayseer had agreed to give R.H., his cousin's friend, a ride home from work. R.H. was at Tayseer's apartment when Nedir arrived. All three left at about 5:15 p.m. in Tayseer's red Toyota Camry to drive R.H. home.

¶ 11    While they were driving Nedir received a message from Caldwell, who was a high school acquaintance of Nedir's, stating he wanted to buy the phone Nedir was selling. Tayseer was hesitant to drive to the location where Caldwell was because he felt the apartment complex was "iffy." Eventually, they went to the apartment complex and Tayseer told R.H. he would drive her home after Nedir sold the phone.

¶ 12    When they arrived at the entrance of the apartment complex, Nedir waved Caldwell over. Caldwell entered Tayseer's car on the rear driver's side. Tayseer was texting with his girlfriend and facing forward in the driver's seat but could see Caldwell through his rearview mirror. Caldwell inspected the phone and stated that he intended to buy it but needed to go to his apartment to get his money.  Tayseer drove him closer to his apartment and Caldwell went into the building.  He returned within a minute and reentered the car.  Nedir then handed Caldwell the phone and then Tayseer heard the shooting begin. Tayseer testified that the shots were coming from the backseat of his car. He felt the bullet enter the back of his right shoulder. Tayseer remembered looking to his right and noticing that both Nedir and R.H. were gone, his car was in

shambles, there was blood everywhere and the windows were shot out. Tayseer also saw Caldwell run from the car back in the same direction he had gone to get the money.

¶ 13    Tayseer testified he had a 9-millimeter Springfield Armory (Springfield Armory) handgun mounted on the side of his console near his right lower leg for which he had a concealed carry license. After he was shot and everyone was out of his car, Tayseer tried to grab his gun but he had very little mobility in his right arm because of the gunshot wound. He was able to cock the gun and look around to see if there were multiple shooters. He tried to step out of his car but because of the blood loss he fell to the ground and dropped the gun in the driver's seat. Tayseer testified that he never pointed his gun at anyone.

¶ 14    Tayseer waited for the ambulance to arrive and was transported to Christ Hospital and remained hospitalized for a week. Because the bullet hit an artery and caused excessive bleeding, Tayseer underwent surgery to cauterize the gunshot wound to his shoulder. The bullet was not removed for fear of potentially causing severe nerve damage and loss of feeling in his right arm.

¶ 15    Tayseer testified that he had additional ammunition for his gun hidden under a manual in the car's glove compartment. He also had $200 in a closed change compartment near the left side of his steering wheel. He never touched that money during the shooting and no money had ever changed hands inside his car that day. Tayseer also stated he had from "a while back" a "minuscule amount of marijuana" in a small bag inside his duffel bag where he usually carries his gym clothes. On cross-examination, Tayseer testified that his 9-millimeter Springfield Armory was loaded with closed tip 9-millimeter bullets which he uses at the gun range. In his glove compartment, Tayseer had a box of Hornady Luger 9-millimeter hollow point bullets, which are not allowed at the range, and an ammunition magazine. Tayseer testified he only

owned the one gun, and all the ammunition was for that gun. The magazine in his glove box contained full metal jacket bullets just like his gun.

¶ 16    R.H. testified that she was 20 years old and employed at a coffee shop. On May 9, 2019, she was 17 years old and working at McDonald's. Tayseer, her friend's cousin, was giving her a ride home from work that day. Tayseer needed to meet Nedir, who she was not acquainted with, at Tayseer's apartment, so R.H. went to the apartment with Tayseer and waited for Nedir.  After Nedir arrived, the three of them left in Tayseer's car. R.H. sat in the middle rear seat and from there, she saw a gun attached to the console under the steering wheel by Tayseer's right leg. She had not seen the gun previously.  R.H. then moved over to the passenger seat behind Nedir.

¶ 17    Nedir asked if they could take R.H. home after he dropped a phone off to a friend.  R.H. agreed. Shortly after arriving at an apartment complex, Nedir waved at Caldwell who walked over to the car and got in the back seat next to R.H., directly behind Tayseer.  Caldwell was introduced to her, shook her hand and made small talk with Nedir. R.H. was not paying attention to what Caldwell was doing. Caldwell told Nedir he had to get his money. They drove closer to Caldwell's apartment building and parked. Caldwell left and returned shortly thereafter.  He got into the rear driver's seat.  R.H. was on her phone, but she looked over at Caldwell and saw him take something from his pocket which she assumed was his wallet. She looked back at her phone and Caldwell starting shooting.

¶ 18    R.H. heard three shots.  Her ears popped, and she saw smoke. Caldwell was pointing a black gun at Nedir, but as R.H. looked at Caldwell, he brought his arm over towards her face, made eye contact with her and fired, striking her in the left side of the bridge of her nose. The bullet went straight through her nose and scrapped the skin under her right eye. She showed the court her scar.

¶ 19    She opened the rear passenger side door, trying to get out of the car and Caldwell shot her again, this time striking her in the back top of her left tricep. She showed the court this scar too. R.H. ran away from Tayseer's car and could hear more gunshots and Nedir screaming. R.H. started to run back towards the car and saw Nedir running towards her and the two ran away together to get help.

¶ 20    R.H. testified that Tayseer never reached for his gun, Nedir never reached for a gun, she never heard anyone struggle with Caldwell, and that Caldwell was the only person holding a gun. She did not see anyone in the car with any cash. When the police and ambulances arrived, she spoke with the officers and was taken to Christ Hospital.  Plates had to be put in R.H.'s nose because the nasal bony triangle was gone.  She received stitches to her nose and eye where the skin separated and her arm was wrapped. A few days later, R.H. viewed a photo array and identified Caldwell as the shooter.

¶ 21    The parties stipulated to the testimony of James Doherty, a physician at the Advocate Christ Medical Center who was working in the emergency room on May 9, 2019, and treated the victims. R.H. was treated for a gunshot wound to the nose and the upper left arm and received emergency operative repairs because her entire nasal bony pyramid had been destroyed.  Entry and exit wounds were observed at the base of her nose and multiple bullet fragments were retrieved. Tayseer was treated for a gunshot wound to the right posterior shoulder that resulted in a shoulder blade fracture.  He underwent surgery and was found to have multiple bullet fragments within his body, including two large bullet fragments near his chest wall that were determined too risky to remove. Nedir was treated for multiple gunshot wounds including one gunshot wound to his neck, one gunshot wound to his chin, two gunshot wounds to his right arm, two gunshot wounds to his right leg, two gunshot wounds to the lower right side of his back, one

gunshot wound to the lower left side of his back, and two gunshot wounds to his spine. Nedir underwent surgery where one fired bullet was extracted from his neck and one from his back.

¶ 22    Sergeant Michael McNamara of the Justice Police Department responded to a report of shots fired at 8705 West 86th Place in Justice, Illinois.  When he arrived, he saw all three gunshot victims and learned the suspect's name was "Kavonte." Based on the location of the shooting, when Sergeant McNamara heard the name "Kavonte" he thought of Caldwell who he was familiar with and proceeded to Caldwell's apartment. Caldwell's grandmother and her son were present in the apartment and gave consent to search. A black 9-millimeter Glock 26 handgun with an empty eight bullet capacity magazine and an attachment were recovered from the floor between two sections of the couch that had been pulled apart.

¶ 23    Detective Sergeant Joseph Malloy of the Justice Police Department testified that on May 9, 2019, he attempted to locate Caldwell but was unsuccessful.  He then went to the hospital and spoke with Tayseer about the incident.  He spoke with Nedir and R.H. several days later.

¶ 24    Crime Scene Investigator Matthew Meyers of the Illinois State Police testified that he processed the crime scene.  At trial, he was shown numerous photographs taken of the surrounding scene and inside of the car which he identified, described, and explained in detail. Tayseer's red Toyota was towed to the Justice Public Works building and once a search warrant was obtained, Meyers was able to enter the car to take additional photographs and retrieve more evidence.

¶ 25    Myers recovered a black Springfield Armory gun, which was loaded with Blazer 9mm bullets, from the driver's side area. He explained that, as shown in the photograph of the Springfield Armory gun, he had made the gun safe by pulling the slide back and removing the bullet from the chamber and removing the magazine which was inside the handle of the gun.  A

silver magazine and a box of ammunition were recovered from the glove box. The glove box was closed and was free of blood stains.  The magazine was filled with seven Hornady 9mm Luger bullets, and the ammunition box contained 17 hollow point Hornady Critical Defense bullets and eight full metal jacket bullets. Myers explained that full metal jacket bullets are cheaper and are used at gun ranges, and hollow points "mushroom out" when fired.

¶ 26    Meyers observed blood stains and one fired Hornady 9-millimeter cartridge casing on the ground just outside the rear passenger side of the car. He explained that he knew a cartridge case had been fired because of the indentation in the middle which means the firing pin hit the back of the cartridge causing the bullet to be extracted.  He also recovered eight more Hornady 9-millimeter fired casings: one fired casing from the rear driver side floorboard, three fired casings from the rear passenger's seat, one fired casing from the rear driver side seat, one fired cartridge casing from the rear dashboard between the rear window and rear seating, one fired casing from the rear bumper when he opened the trunk, and one fired casing from the front passenger side floorboard. Meyers testified that he recovered one fired projectile from the area between the driver's seat and center console and one fired projectile from the rear driver's side seating area. Meyers observed that the front driver side window, front passenger side window and rear passenger side window were all shattered and that there was blood in the front driver's seat, the front passenger's seat and on the rear passenger side door. Meyers observed no blood or bullet holes on the rear driver side door and seating area and the window was intact. In a compartment just below the steering wheel, Meyers recovered ten folded $20 dollar bills.  None of the bills were soiled with any blood.

¶ 27    The parties stipulated that if Jeffrey Parise, a forensic scientist at the Illinois State Police Crime Lab, was called to testify he would be qualified as an expert in the forensic

science of firearms identification.  Parise testified to the procedures and equipment used to compare cartridge cases and fired bullets to a particular weapon to determine if they were fired from that weapon. Parise test-fired a bullet from the 9-millimeter Glock 26 recovered from Caldwell's apartment, and compared the general and individual class and characteristics of the fired bullet and cartridge case with the nine recovered Hornady 9-millimeter Luger fired cartridge cases, the fired bullet jacket, and fired bullet. It was his expert opinion that the fired cartridge cases, the fired bullet jacket, and the fired bullet were all fired from the 9-millimeter Glock 26.  The State then rested.

¶ 28    Caldwell testified on his own behalf. He testified that he met Nedir his junior year in high school and that they had a friendly relationship. In 2019, Caldwell bought cannabis from Nedir twice. On May 9, 2019, around noon, Caldwell contacted Nedir through Snapchat requesting to buy cannabis and Nedir agreed to sell him two ounces for $500. Nedir stated that he would deliver it to Caldwell's home in a couple of hours. Caldwell shared his location with Nedir through Google maps.

¶ 29    Later that day, Caldwell received a Snapchat notification from Nedir that he was arriving at Caldwell's apartment building.  After initially having trouble finding the car, Caldwell located the red Toyota and approached the passenger side window of the car but Nedir instructed him to go to the driver side rear so they could be discreet and have a low profile. Caldwell entered and sat behind the driver who he really could not see because of the headrest. Nedir was in the front passenger seat and a young lady was next to Caldwell looking out the window and on her cell phone.

¶ 30    Caldwell and Nedir had a quick conversation about school and football and then Nedir handed Caldwell the cannabis, which he examined.  He told Nedir he wanted to buy it. Caldwell

was shown a photo of a brown duffel bag with a small plastic bag of cannabis within and denied that was the cannabis Nedir was selling him. Caldwell testified that he agreed to purchase "a real large bag." Caldwell stated that the duffel bag from the photo was on the passenger floor when he entered the car. Caldwell realized he did not have his wallet and said he would be right back. Nedir offered to drive him back to his apartment.

¶ 31    Caldwell went to his apartment, got his wallet and returned to the car. Nedir handed the cannabis over and Caldwell turned on the flashlight on his phone and confirmed it was the purple cannabis he preferred. Caldwell testified he handed the cannabis back to Nedir, pulled out his money and started counting it when Nedir "snatched" $200 of the money with his right hand and "upped" the 9-millimeter Glock 26 in his face with his left hand. Caldwell put his wallet back in his pocket and raised his hands in the air. The car was quiet, and Caldwell could see Nedir was serious and about to pull the trigger. Caldwell then "smacked" Nedir's arm up from his face. Caldwell testified, "[t]hat's when I punched Nedir, or slapped his arm from the vision - - having the barrel from my face. As I hit [Nedir], a shot went off." When the gun went off, both Nedir and Caldwell's hands were on the gun and the gun was aimed toward the driver. Caldwell's hands were both on the gun and on Nedir's hands, trying to disarm him. During the struggle over the gun, Nedir was reaching into the back seat, but his legs were still in the front seat. The gun fired two to three more times, and the bullets went past Caldwell's face. Caldwell stated that he "blacked out" when the gun was being fired and did not know how many shots were fired. He also claimed that he was unaware that Tayseer and R.H. were shot until the day of trial. Yet, Caldwell also testified that they continued to struggle over the gun for about 30 seconds and the gun went off at least seven times. Nedir finally let his right hand go so Caldwell started to twist Nedir's wrist to disarm him. Caldwell testified that at that moment, the gun was pointed at Nedir

and while Caldwell was "yanking and yanking" the gun from him, it went off and Nedir finally let go. Caldwell then got out of the car, ran to his grandmother's apartment and put the gun under the couch.

¶ 32     After he hid the gun, he went to his friend David's house in Harvey.  Caldwell testified that he did not communicate with anyone until he called his mother the next day. He explained this was the first time something like this had ever happened to him, so he was scared, in shock and did not know what to do. He denied planning to buy an iPhone from Nedir. He also denied the gun was his, and further denied that he ever pulled out a gun and shot the three victims or took any property from them other than the gun.

¶ 33     On cross-examination, Caldwell testified that Nedir had previously sold him cannabis in January and March 2019. Each time he contacted Nedir through Snapchat and Nedir came alone to Caldwell's apartment complex. Nedir never pulled a gun on him.  After Nedir took the money from his hands, Caldwell testified he was able to stuff the remaining $300 in his pocket. Caldwell also testified that after smacking Nedir's hands, he did not know where the first bullet went but then testified that the gun was pointed at him and when the first bullet hit, it was towards the driver. Later he testified he smacked Nedir's arms downward and the next two or three bullets went past his face while he tussled with Nedir. Caldwell could not recall how many times the gun went off at that point because his ears were popping, and he could not see where the bullets went because he kept closing his eyes. Caldwell rested.

¶ 34     At closing argument, defense counsel argued, "It makes no sense that [Caldwell] would open fire on three people in an automobile in broad daylight in front of many people right where he lives. For an iPhone? Such an item has little value. And the allegations you heard here are startling." Counsel also argued that some of the unfired ammunition recovered from Tayseer's

glove compartment matched the discharged cartridge casings and that no ammunition was recovered from Caldwell's apartment. Counsel further argued:

"So when crimes occur, the first question is usually why? There is usually a motive, an explanation. The motive alleged here is unsatisfactory.

Kavonte was trained in athletics. He was a star football player. So when confronted with a weapon, his instincts to react are fast, and he grabbed the firearm and a struggle ensued, and shots went in multiple directions. There's money there, there's cannabis there, there's guns there, there's ammunition. There's more than a simple iPhone."

¶ 35    The State agreed with defense counsel that "this doesn't make any sense." The State further argued, "[b]ut what really doesn't make sense is the struggle that the defendant described." The State argued that Caldwell's version of events did not coincide with the physical evidence, and further that, based on the location of the victims' injuries Caldwell's story did not make sense. The State further argued that the only thing that made sense was that Caldwell was trying to kill Nedir as Nedir tried to get away and that this was clearly not a self-defense case because Caldwell was not scared for his life.

¶ 36    Following arguments from both sides, the trial court collected all the exhibits and took a recess to review them. The court found that this was not a self-defense case because Caldwell never testified that he took the gun and fired it because he was in fear for his safety. Rather, Caldwell claimed he did not possess the gun but merely struggled over the gun with Nedir while Nedir's hands were on the trigger, at which time Nedir, Tayseer and R.H. were shot. The court found that "his defense is one of pretty much a reckless or an accidental act by the victim in shooting himself and shooting his other people because the defendant, as he claims,

13

was smart enough to struggle for the weapon."

¶ 37    The court found that there was no struggle over the money, noting that not a single bill was crinkled during this massive shootout even though Nedir supposedly "snatched" the money from Caldwell.  Instead, the $20 bills were neatly folded when they were found in the compartment in Tayseer's car.  The court also questioned where the cannabis was if this was in fact a drug deal.  The court said it was possible that there was a drug deal going on but found it "improbable" that was the case where the victims were all shot, and no cannabis was found. The court further determined that the extra clip recovered from the glove compartment only fit Tayseer's 9-millimeter Springfield Armory gun, and that the clip for the 9-millimeter Glock 26 only fit that gun. The court explained that it tried to put the clip for the 9-millimeter Glock 26 in Tayseer's Springfield Armory gun, but it was too wide.

¶ 38    The court further ruled:

> "There is in this case two separate stories. The victims' story in this case, I agree with Mr. Doherty [defense counsel], seems improbable. That the defendant, knowing somebody, in his own apartment area, came out to execute three people over a cellphone. That is an improbable story.
>
> The defendant's story, on the other hand, is impossible. There is, I guess, a difference between improbable and impossible. There is no way that the physical evidence that I'm looking at that occurred in this case occurred the way the defendant said. Not a single bullet hole is in the direction of where the defendant was seated. Nothing in the back of that vehicle, in the section where the defendant was at -- even though the victim supposedly had the gun at that time, or at least possession of it -- sent a projectile in any way towards the defendant in this case. Even though he said one went by

his head. There is no evidence of that in the case. For the bullet holes to land how they did, it would be impossible, in the description the defendant gave.

The victim, the young lady who was seated next to him, is shot through the left side of the nose, out the right side and out the right window. There is no other bullet holes going that way. And it clearly went through her nose, out the other side, and the bullet went out that window to there, meaning she was faced forward. That gun would've had to have been in the backseat, straight across her face in order to go and go through that window. The gun was never there, according to the defendant, in that way.

The man with the trigger is pointing the direction of defendant. Yes, he can bend it to one direction or another, but how is the victim hit in the back of his legs in the front seat? How is the second victim, Tayseer, hit in the back of the shoulder? The bullets here do not match in any way, shape, or form with the description of the defendant and how this incident occurred.

Yes, I agree with you, Mr. Doherty, that this is possible that this is not about a cellphone, it's possible that it's about marijuana. Improbable but possible that it's about that. But at some point your client, Kavonte Caldwell, got possession of that gun and he lit up everybody in that car. And there was no self-defense at that time. He fired and directly hit people in the back, in the spine, in the sides, across the face. At some point this was not just an even spraying where he got hit not at all, but he had possession of that gun at a time when he was larger than everybody else in that car – they are all much smaller than him -- at a time when he had possession of that weapon, where he does not claim, nor does anybody claim, that other weapon was in play whatsoever, and he started shooting. And he shot a lot. And he hit one person ten-plus times, and most of those shots

were in that person's back. How, if he's struggling over the gun in front of himself, when all these shots that the defendant described, how is he shot in the back time in and time again? Two into the spine, lower back, left, back of the legs. There is no way humanly possible that that's how it occurred.

There is always two sides to a story, and I am a judge that pays attention, and I agree that some of the victims' story seems improbable. But the thing that I am absolutely certain about is your client got possession of that weapon and aimed it at people and fired the gun."

¶ 39    The trial court subsequently found Caldwell guilty of aggravated battery with a firearm to each victim and not guilty on the remaining counts. Caldwell filed a motion for a new trial wherein Caldwell argued that he was not proven guilty beyond a reasonable doubt where he testified that there was a struggle over the gun and shots were fired in multiple directions. He requested that the court reconsider its findings. The court denied the motion stating that "[d]efendant's story was not supported by the physical evidence in this case." The court further found that "[e]verything in this case points to the story of the [d]efendant being completely inconsistent with the physical evidence in this case and consistent with what the story that the victims said or the evidence that they presented during the course of the trial." In addition to reiterating its initial findings, the court noted that the gun's ejection port was on the right side meaning the casings would eject to the right and that the bulk of the casings were found on the far-right side of the car. Thus, the location of the casings supported the victims' version of what occurred, not Caldwell's. The court also stated that Nedir and Tayseer were shot in the back several times and those injuries were inconsistent with there being a struggle over the gun. Rather, the evidence strongly suggested that Caldwell had possession of the gun and began firing

it. The court pointed out that the victims' injuries were consistent with their testimony that they were trying to get out of the car. The court also stated that in looking at the gun and understanding how it fires, "[t]here is no way how the [d]efendant described he was holding the weapon that that weapon went off some 14 times. He was holding the top of the weapon, pushing down on it and on the sides of that weapon."

¶ 40     The court sentenced Caldwell to seven years on each count of aggravated battery with a fireman to be served consecutively for an aggregate sentence of 21 years. This appeal followed.

¶ 41                                    ANALYSIS

¶ 42     Caldwell first argues that the State failed to prove him guilty of aggravated battery with a firearm beyond a reasonable doubt because it was clear when the court deemed the victims' version of the events an "improbable story" that the court did not believe the victims. Caldwell asserts that the State's evidence was insufficient because it required the court to credit a version of events that was "improbable, unconvincing, [and] contrary to human experience."

¶ 43     When reviewing a challenge to the sufficiency of the evidence, this court considers whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). In a bench trial, "it is for the trial judge, sitting as the trier of fact, to determine the credibility of witnesses, to weigh evidence and draw reasonable inferences therefrom and to resolve any conflicts in the evidence." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). A court of review will not retry the defendant or substitute its judgment for that of the trier of fact on questions involving the weight of the evidence, conflicts in the testimony, or the credibility of witnesses. *People v. Gray*, 2017 IL 120958, ¶ 35. After taking all the evidence as a whole, the trier of fact must be convinced of the defendant's guilt beyond a

reasonable doubt, but it need not be satisfied as to "each link in the chain of circumstances." *In re Jonathon C.B.*, 2011 107750, ¶ 60. A conviction will not be reversed for insufficient evidence unless it is so improbable, unreasonable, or unsatisfactory as to raise a reasonable doubt of the defendant's guilt. *Gray*, 2017 IL 120958, ¶ 35.

¶ 44      Here, Caldwell was convicted of three counts of aggravated battery with a firearm, which required the State to prove that he knowingly and without legal justification "[d]ischarg[ed] a firearm *** and cause[d] any injury to another person." 720 ILCS 5/12-3.05(e)(1) (West 2020). Caldwell argued that he was acting in self-defense and was justified in using force. An individual may assert self-defense as an affirmative defense to a charge for conduct that might otherwise constitute a crime. *People v. Lee*, 213 Ill. 2d 218, 225 (2004). A person is justified in using force that "is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." 720 ILCS 5/7-1(a) (West 2020). As our supreme court has explained:

> "Self-defense is an affirmative defense, and once a defendant raises it, the State has the
> burden of proving beyond a reasonable doubt that the defendant did not act in self-
> defense, in addition to proving the elements of the charged offense. [Citation.] The
> elements of self-defense are: (1) that unlawful force was threatened against a person; (2)
> that the person threatened was not the aggressor; (3) that the danger of harm was
> imminent; (4) that the use of force was necessary; (5) that the person threatened actually
> and subjectively believed a danger existed that required the use of the force applied; and
> (6) the beliefs of the person threatened were objectively reasonable. [Citations.] If the

State negates any one of these elements, the defendant's claim of self-defense must fail. [Citation.]" *Id*. at 224-25.

¶ 45    Here, the State proved the elements of the offense of aggravated battery with a firearm beyond a reasonable doubt. The victims, Nedir, Tayseer and R.H., testified that they met Caldwell on May 9, 2019, in Tayseer's car after Nedir agreed to sell Caldwell a phone. The victims testified that Caldwell entered the car and conversed with Nedir. When Caldwell stated he did not have his money, Tayseer drove his car close to Caldwell's apartment. Caldwell went inside and returned about a minute later. As Nedir handed the phone to Caldwell, Caldwell pulled out a gun and starting shooting. Nedir, Tayseer and R.H. testified consistently as to the events that occurred in the car that day.

¶ 46    According to Nedir, who was seated in the front passenger seat, when Caldwell reentered the car, he turned around to hand Caldwell the phone and then saw "sparks, bullets, fire, [and] smoke." Caldwell had a gun in his right hand and was shooting at Nedir. Nedir was shot three times at first, once under the chin, once in the neck and once in the chest. Caldwell then turned to R.H. who was sitting next to him in the back seat and fired at her. Caldwell then looked at Tayseer and shot him twice in the back. Caldwell then looked back again at Nedir and shot him in the left shoulder. As Nedir was trying to protect his face Caldwell then shot him in the right tricep. Nedir then opened the car door and attempted to escape and Caldwell shot him several more times in the back. Nedir was shot 13 times in total. Nedir's testimony was corroborated by the location of the bullet wounds to his body and the damage done by the fired bullets to the inside of the car.

¶ 47    Tayseer's testimony also corresponded with his injury. Tayseer testified that Caldwell shot him from behind in his back right shoulder as he was seated in the driver's seat. Tayseer had

surgery to his right posterior shoulder, which revealed bullet fragments near his chest wall that were too risky to remove.

¶ 48    R.H., who was seated next to Caldwell in the back seat, testified that she saw him reach into his pocket and pull something out, which she thought was his wallet, but then heard three gunshots. She looked up and saw Caldwell pointing a gun at Nedir. Caldwell then pointed the gun at her and shot her in the face. The bullet went through her nose and struck the car window, shattering it. As R.H. tried to escape the car, Caldwell shot her again, striking her in the top back of her left arm. As she ran from the car, R.H. heard additional shots. Nedir was screaming. R.H.'s testimony was also corroborated by her medical records, her scars and the blood on the rear passenger side door.

¶ 49    In addition, when the shooting stopped, Nedir, Tayseer and R.H. remained at the scene, asked for help, and waited for the police and ambulances to arrive. They then spoke to law enforcement personnel.

¶ 50    Matthew Myers, the crime scene investigator from the Illinois State police, testified to the photographs taken by the state police investigators at the scene. Myers identified one photograph of the Springfield Armory gun that was recovered from Tayseer's car, and he explained that he had made the gun safe by pulling the slide back and removing the bullet from the chamber and removing the magazine which was inside the handle of the gun. The bullets were all Blazer 9-millimeter Lugers that had not been fired. Myers further testified that a box of ammunition labeled Hornady Critical Defense containing eight WNA full metal 9-millimeter bullets and 17 Hornady hollow point bullets, and a magazine containing seven live Hornady hollow point 9-millimeter bullets, were recovered from the glove box of Tayseer's car.

¶ 51    Myers also testified that photos admitted into evidence showed blood stains on the seats where Tayseer, Nedir and R.H. had been sitting. They also showed that the driver's side window, where Tayseer was seated, and the rear passenger side window, where R.H. was seated, were blown out. There was no blood or damage to the rear driver's side seat where Caldwell was seated and the window on that side remained intact.

¶ 52    It was stipulated that if called to testify, Jeffrey Parise, a forensic scientist at the Illinois State Police Crime Lab, would be qualified as an expert in the forensic science of firearm identification. He would testify that the 9 recovered Hornady 9-millimeter Luger fired cartridge cases were all fired from the 9-millimeter Glock 26.

¶ 53    The only evidence presented to support Caldwell's self-defense claim was his own testimony. Caldwell testified that he met the victims to buy $500 worth of marijuana from Nedir. He left Tayseer's car to get his money and when he returned, Nedir snatched $200 out of his hand and pointed a 9-millimeter Glock 26 at him. Caldwell put the remaining $300 in his wallet. Then, with Nedir pointing the gun at his face, Caldwell smacked Nedir's arms downward with both of his hands and the gun went off towards Tayseer. Caldwell had his hands on top of Nedir's hands and the two struggled over the gun while Caldwell was still in the back seat and Nedir was still in the front passenger seat. The gun went off two or three more times, and Caldwell claimed those bullets went past his face as he was looking at an angle towards the front passenger seat. While Caldwell continued to struggle over the gun in Nedir's hand from the back seat of the car, Caldwell twisted Nedir's wrist, which was pointing towards Nedir's back, when the gun went off again. Caldwell stated that he "blacked out" when the gun was being fired and did not know how many shots were fired.

¶ 54    When the shooting ceased, Caldwell fled the car with the gun and hid it in his apartment under the couch. He then went to his friend David's house. He turned himself in months later, after a warrant for his arrest was issued.

¶ 55    The court found that Caldwell did not act in self-defense and that his version of events was "impossible" in addition to being entirely contradicted by Nedir, Tayseer and R.H.'s testimony, whom the trial court found credible. Nedir, Tayseer and R.H. testified consistently with each other that Caldwell entered the car with a gun and started shooting at them. Their wounds and the physical evidence supported their version of events.

¶ 56    The court then commented on some of the over 150 exhibits admitted into evidence. The court rejected Caldwell's argument that his theory that Nedir was the aggressor who pulled the gun on him was supported by the fact that the ammunition box in the glove compartment of Tayseer's car contained the same make of bullets as the fired bullet casings recovered in the car. The court observed that the fired bullet casings did not come from the box of ammunition recovered from the glove compartment of Tayseer's car because the letter spacing of the stamped brand name, Hornady Luger, did not match the bullets in the box and because the bullets that were missing from the box of ammunition were in a clip at the bottom of Tayseer's glove box. The court also observed that the letter spacing on the bullets in the extra clip recovered from the glove compartment matched those bullets in the box of ammunition.

¶ 57    The court also found that there was no struggle over the money as Caldwell testified, observing that not a single note of the $200 in recovered currency was crinkled. Rather, the bills were all neatly folded and placed in a small compartment.

¶ 58    The court also found that Tayseer's Springfield Armory gun "wasn't part of the incident that occurred here" because "[Caldwell] doesn't claim it was pulled on him" and "the victim

doesn't claim he pulled that gun on [Caldwell] to start this melee." The court ultimately concluded that that "there is no connection between the two weapons here." Nevertheless, the court determined that the extra clip recovered from the glove compartment only fit Tayseer's 9-millimeter Springfield Armory gun, and that the clip for the 9-millimeter Glock 26 only fit that gun. The clip from the Glock was too wide to fit in Tayseer's Springfield Armory.

¶ 59     As the trial court noted, Caldwell's self-defense claim was "pseudo self-defense" in that it was "one of pretty much a reckless or an accidental act by the victim in shooting himself and shooting his other people because the defendant, as he claims, was smart enough to struggle for the weapon." The trial court heard all of the testimony and did not believe Caldwell's testimony that he acted in self-defense, finding his version to be "impossible" given the evidence. The court stated, "the thing that I am absolutely certain about is your client got possession of that weapon and aimed it at people and fired the gun." The court was not required to credit Caldwell's testimony. See *Gray*, 2017 IL 120958 ¶51 ("In deciding a claim of self -defense, it is the function of the [trier of fact] to assess the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence.").

¶ 60     Caldwell argues that the court's use of the term "improbable" to describe the State's case establishes that a rational factfinder could not have found the existence of proof beyond a reasonable doubt. The court did use the word "improbable," but not to describe the State's overall case. Rather, the court stated that it was "improbable" that, as the victims testified, the transaction between them and Caldwell involved a cellphone, and not something else like cannabis. The court's use of the term "improbable" to describe a portion of the victims' testimony regarding motive does not negate the evidence of Caldwell's guilt. "It is sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the

defendant's guilt." (Internal quotation marks omitted.) *People v. Peoples*, 2015 IL App (1st) 121717, ¶ 67.

¶ 61    In this case, the evidence overwhelmingly supported Caldwell's guilt. The trial court concluded that there was sufficient evidence presented at trial to prove Caldwell guilty of aggravated battery with a firearm beyond a reasonable doubt where the evidence showed that Caldwell "aimed [the gun] at people and fired." Viewing the evidence in the light most favorable to the State, we find that a rational trier of fact could have found Caldwell guilty of aggravated battery with a firearm.

¶ 62    Caldwell next argues that he was denied due process because the court improperly relied on its private knowledge about the function and capabilities of the gun used during the incident and made two factual findings based on that private knowledge. First, Caldwell argues that the court improperly found that based on the location of the ejection port on the gun and the location of the fired cartridge casings, the gun was fired from where Caldwell was seated in the backseat and not from the front passenger seat where Nedir was seated. Second, Caldwell argues that the court found that his testimony about the struggle over the gun was incredible because the gun would not have been fired with the pressure caused by Nedir and Caldwell's hands on the slide on top of the gun. Both of the comments Caldwell complains of occurred during the court's ruling on Caldwell's motion for a new trial, not when the court pronounced him guilty.

¶ 63    As the trier of fact the trial court is "free to accept or reject as much or as little as it pleases of a witness' testimony" (*People v. Nelson*, 246 Ill. App. 3d 824, 830 (1993)) and "may take into account her own life and experience in ruling on the evidence" (*People v. Thomas*, 377 Ill. App. 3d 950, 963 (2007)). However, in a bench trial, the judge is limited to the record developed during the course of the trial before her. *People v. Wallenberg*, 24 Ill. 2d 350, 354

(1962). "A determination made by the trial judge based upon a private investigation by the court or based upon private knowledge of the court, untested by cross-examination, or any of the rules of evidence constitutes a denial of due process of law." *Id.*

¶ 64     This court need only reverse a court's determination when the trial court's reliance on matters outside the record is prejudicial to one of the parties. *People v. Banks*, 102 Ill. App. 3d 877, 882 (1981). However, "[r]eliance on information found [outside] the record is not reversible error where there is no evidence that it either misled or entered into the trial court's determination." *Id.* We afford a trial court every presumption that it considered only admissible evidence in reaching a conclusion. *Wallenberg*, 24 Ill. 2d at 354. "This assumption will be overcome only if the record affirmatively demonstrates the contrary, as where it is established that the court's finding rests on a private investigation of the evidence, or on other private knowledge about the facts in the case." *People v. Tye*, 141 Ill. 2d 1, 26 (1990). The issue of whether the defendant was denied due process by the trial court's reliance on information outside the record is reviewed *de novo*. *People v. Dameron*, 196 Ill. 2d 156, 171-72 (2001).

¶ 65     The comments complained of here do not evince error because they neither reflect personal knowledge of the facts of this case nor a private investigation. To the contrary, the trial court was merely analyzing, discussing and commenting on the physical evidence, drawing reasonable inferences from the evidence and the testimony presented at trial, and explaining its ruling on the witnesses' credibility based on its own life experience. The trial judge, as the trier of fact in this case, found Caldwell's version of events to be "impossible" and the court thoroughly explained how it arrived at that conclusion when it found Caldwell guilty, and then confirmed its belief of Caldwell's guilt by supplementing its explanation of its decision in the ruling denying Caldwell's motion for new trial.

¶ 66    In *People v. Gilbert*, 68 Ill. 2d 252 (1977), the defendant was convicted of murder following a bench trial. According to the defendant, the victim, who was staggering, was carrying a shotgun in her right hand that was extended downward in the manner a hunter would carry a gun while walking. The defendant demonstrated how the victim was holding the gun. The victim began to walk away when the defendant "grabbed the stock of the gun and [the victim] hit back at him with her elbow causing the barrel of the gun to hit the door and the stock to strike the refrigerator on an angle." *Id*. at 256. The gun discharged a single shot which hit the victim, killing her. *Id*. In finding the defendant guilty, the court stated, "I have examined the weapon in question and whether the fact it was cocked or not cocked in the manner and shape in which the defendant *** described the accident as happening *** [and] find it implausible and therefore unbelievable that it occurred in [that] manner and form." *Id*. at 257-58.

¶ 67    Our supreme court found that the circuit court's comments did not affirmatively show that it conducted an improper test or experiment with the gun. *Id*. at 260. In so concluding, the court noted that the examination of the gun could properly assist the circuit court during its deliberation. *Id*. "We do not agree that the shotgun itself could not have assisted the court in reaching its decision or that the trial judge's remarks show that he conducted an improper test or experiment with the gun. In view of the defendant's demonstration of the manner in which the gun was handled during the shooting incident, we believe that examination of the gun itself could properly assist the judge during his deliberation." *Id*. In addition, the court found that the circuit court's comment indicated that the gun's mechanical operation had no bearing on the circuit court's determination; that irrespective of the mechanical functioning of the gun the court did not believe that the shooting occurred in the manner described by the defendant. *Id*. The court found:

"We also note that there was no evidence during trial as to whether the gun had to be cocked for it to fire but that this matter was nevertheless brought up by counsel in closing argument. In this context, it appears that the remarks of the trial judge regarding the gun were intended to make it clear that the gun's mechanical operation had no bearing upon his decision. In other words, that irrespective of the mechanical functioning of the gun, he did not believe that the shooting could have occurred in the manner described by the defendant in view of the totality of the evidence, including the manner in which the gun was being carried by the deceased, the length and other physical characteristics of the gun and the angle and location of the wound." *Id.*

Therefore, the *Gilbert* court found there was nothing in the record to rebut the presumption that the circuit court considered only competent evidence in reaching its determination. *Id.*

¶ 68       Similarly in *People v. Kurena*, 87 Ill. App. 3d 771, 775 (1980), the jury constructed and experimented with a cardboard knife during their deliberations after the actual knife used by the defendant was admitted into evidence. The jurors used the cardboard knife to determine whether the victim's wounds could have resulted from a right-handed or left-handed stabbing based on the position of the parties and whether the knife could be concealed in a sleeve or seen at a distance. We found that the jury's experiments were performed within the bounds of the evidence produced at trial, because the actual knife was admitted into evidence and there was evidence both that defendant hid the knife in his sleeve and that the wounds could have been caused by either a right-handed or left-handed person. *Id.* at 775-76.

¶ 69       Here, by arguing self-defense, Caldwell put at issue who was holding the gun, how the gun was being held, and when the gun was fired.  In examining the gun, the court was able to observe that the ejection port for the gun was on its right side and reasonably inferred that the

casings would have discharged to the right. The court also looked at the location of where the casings landed and reasonably inferred that if Nedir, who was seated in the front passenger seat of the car, was the person holding the gun, as opposed to Caldwell, who was seated in the rear of the car, the casings would have fallen to the right of the gun, on the driver's side. But they did not. All but two of the recovered casings came from the rear passenger or right side of the car, including one on the ground outside the passenger side door and one on the right rear bumper where it meets the trunk, leading the court to conclude based on the physical evidence that the gun was being shot from the rear driver's seat and the shooting could not have occurred as Caldwell described it.

¶ 70    In addition, the court drew on its general knowledge of how a semi-automatic weapon works and, in conjunction with Myers's testimony regarding how the slide of the gun needed to be pulled back to remove a bullet from the chamber, reasonably concluded that the gun would not operate if Caldwell and Nedir's hands were on the slide when they were struggling over the gun as Caldwell claimed, thus further explaining why Caldwell's version of events was "impossible." The court drew a reasonable inference that any lay person could have drawn based on the evidence. There is nothing here to rebut the presumption that the court considered competent evidence in determining Caldwell's guilt. See *People v. Christensen*, 2021 IL App (1st) 192579-U, ¶¶ 56-59 (finding the trial court did not err when it privately measured a knife and made technical conclusions about the capabilities of the knife based on its private investigation, but rather engaged in its duty of weighing the evidence, making inferences from the evidence, and determining the credibility of the witnesses); *People v. Williams*, 2021 IL App (5th) 190251-U, ¶¶ 44, 46 (finding no error where trial judge relied upon his own personal preexisting and general knowledge of working farms in assessing the defendant's testimony in

comparison to the victim's testimony to determine whose testimony more accurately described the day-to-day realities of a working farm in southern Illinois, and did not conduct a private investigation of the evidence or rely upon private knowledge of the facts of the case); Ill. S. Ct. R. 23(e)(1) (eff. Jan. 1, 2021) (permitting citation of nonprecedential orders entered on or after January 1, 2021, for persuasive purposes). The trier of fact is entitled to use his general knowledge and observations in life when considering the evidence presented. See *Thomas*, 377 Ill. App. 3d at 963.

¶ 71     Caldwell was not denied a fair trial. In so finding, the dissent conflates the court's comments on the evidence when it found Caldwell guilty with its comments regarding its deliberative process when it denied Caldwell's motion for a new trial.  Furthermore, the dissent's insistence that the trial court improperly relied on its general knowledge and observations in life when it considered the testimony and the physical evidence in this case and violated "every notion of fair play and due process" because the court was unable to be cross-examined (supra ¶81) ignores the critical role of the court as the trier of fact to deliberate over the evidence (*Siguenza-Brito*, 235 Ill. 2d at 228 (2009) ("it is for the trial judge, sitting as the trier of fact, to determine the credibility of witnesses, to weigh evidence and draw reasonable inferences therefrom and to resolve any conflicts in the evidence") and misconstrues our role as a court of review (*Gray*, 2017 IL 120958, ¶ 35) (it is not the job of the appellate court to retry the defendant or substitute its judgment for that of the trier of fact on questions involving the weight of the evidence, conflicts in the testimony, or the credibility of witnesses). The court here did precisely what it was required to do, determining which of the widely conflicting accounts made sense based on an examination of the properly admitted evidence and everyday experience. See *People*

*v. Gilbert*, 68 Ill. 2d at 260 (examination of the gun itself could properly assist the judge during his deliberation).

¶ 72     Moreover, even if the court considered facts outside the record, any error was harmless because the evidence of Caldwell's guilt was overwhelming and did not affect the result. *In re T.R.*, 2019 IL App (4th) 190529, ¶ 112 (court's consideration of facts outside the record–the definition of sperm fraction and the requirements for successful DNA typing–was harmless error when the result was not affected. The circumstances here are remarkably similar to *In re T.R.*, where the evidence outside the record "merely confirmed the court's beliefs more than it persuaded the court," and the "court's comments here appear to be in response to respondent's arguments, and the court primarily and carefully considered other evidence that was properly before it to render its decision. The court's comments at issue did not serve as a basis for its determination." 2019 IL App (4th) 190529, ¶¶ 112-13, 119.

¶ 73     For a judge's comments indicating personal knowledge to constitute reversible error, the defendant must show that such remarks were prejudicial and defendant suffered harm as a result. *See People v. Jennings*, 364 Ill. App. 3d 473, 483 (2005). Here, the court made the complained-of comments at the hearing on Caldwell's motion for new trial, not when it pronounced Caldwell guilty weeks earlier based on overwhelming evidence. Therefore, Caldwell could not have been prejudiced. *Id*. at 482-84 (even if court relied on personal knowledge when it stated that the amount of narcotics recovered was more than what would be normal for personal consumption, defendant was neither harmed nor prejudiced when the court's remark occurred at sentencing and after court had arrived at its guilty determination).

¶ 74     Although the dissent recognizes that Caldwell makes two separate arguments regarding the evidence in this case (supra ¶81), incongruously it states, "whether we consider this as

insufficient evidence in the record or a due process violation from evidence outside the record, the result is the same. We must reverse." (Supra ¶ 118, 123-24). However, Caldwell's alternative claims on appeal present distinct issues that require separate analysis and lead to different results. If the evidence was insufficient, as the dissent finds (supra ¶ 123-24), then Caldwell's conviction must be reversed outright. *People v. Thompson*, 2017 IL App (3d) 160503, ¶ 17 (if the evidence is insufficient to convict, then a defendant's conviction must be reversed outright.). But if the trial court relied on impermissible evidence, as the dissent also finds (supra ¶¶ 118-122, 124), then Caldwell's conviction must be reversed and the case remanded for a new trial, provided there are no double jeopardy issues. See *People v. Petrov*, 2023 IL App (1st) 160498, ¶ 70 (reversing and remanding where the defendant was denied due process after the trial court relied on private knowledge and experience of domestic violence in finding the defendant guilty of murder). Therefore, the result is not the same.

¶ 75                                   CONCLUSION

¶ 76    Based on the foregoing, the judgment of the circuit court is affirmed.

¶ 77    Affirmed.

¶ 78    Presiding Justice Oden Johnson, dissenting:

¶ 79    As the majority notes, defendant raises two claims: (1) that the State failed to prove him guilty beyond a reasonable doubt; and (2) that he was denied a fair trial when the trial judge relied on the judge's own ballistics knowledge in finding defendant guilty. Acting as factfinder, the judge found the State's witnesses' account of events to be "improbable." The judge nonetheless found defendant guilty, explaining: "This case undoubtedly was decided by ballistics evidence." However, no ballistics expert testified at trial, and, in his ruling, the judge explained to the parties that he was relying on his own "test[s]" of the ballistics evidence and his own

knowledge.[1] Accepting, as we must, the fact finder's determination of credibility, I cannot condone the trial court's reliance, as the key and decisive factor, on tests and examinations that he performed outside the record, thereby depriving defendant of any opportunity for cross-examination of the "expert." This violates every notion of fair play and due process. For reasons that I explain in more detail below, I would reverse and, thus, I must respectfully dissent.

¶ 80                                    BACKGROUND

¶ 81    When the shooting at issue occurred, defendant and the three victims were sitting inside a parked car, discussing a contemplated sale by one of the victims to defendant. Just before the sale was complete, multiple shots were fired, with the entire shooting lasting 30 seconds or less.[2]

¶ 82    I write the facts separately to emphasize how much the parties agree on and what exactly is disputed and also to detail the trial court's remarks and ruling, which were beyond the pale in his zeal to aid the prosecution and to fill in the holes that the State had left blank.

¶ 83    The State's witnesses testified that the purpose of the meeting in the car was to sell defendant a cell phone, whereas defendant testified it was to sell him marijuana. All four occupants of the car testified at trial, including defendant who claimed self-defense. Defendant claimed that the seller pulled out a gun in an attempted robbery of defendant's cash, that the two men struggled over the gun, and that the gun fired repeatedly during the less-than--30-second struggle. In contrast, the seller and one of the victims testified that defendant shot them, ostensibly for an iPhone 6S Plus.[3]

---

[1] There was a stipulation regarding a ballistics expert; however the judge's findings about the ballistics evidence were not in the stipulation.

[2] One of the victims testified that the shooting occurred in "20 seconds not even." Similarly, defendant testified that it lasted no more than 30 seconds.

[3] The seller testified at trial that the subject of the sale was an iPhone 6S Plus.

¶ 84    The indictment charged defendant with three counts of attempt murder and of aggravated battery with a firearm, for each of the three car occupants, namely, (1) Nedir Mohammed; (2) Tayseer Hamdan; and (3) a 17-year old girl.   Mohammed was the seller in the contemplated transaction and a school friend of defendant; Hamdan was the driver and a friend of Mohammed; and the girl, who knew the driver, was just hoping for a lift home. Defendant was also charged with the armed robbery of "an iPhone" from Mohammed, the seller. After the bench trial, the judge acquitted defendant of the more serious charges, namely, the attempt murder and armed robbery charges, but convicted him of all three aggravated batteries.

¶ 85    Both sides agree on the following basic facts:  On May 9, 2019, Mohammed, age 21 and one of the victims, set up a possible sale and a meeting with defendant, age 20, who Mohammed knew from high school. Hamdan, age 25, and a friend of Mohammed, drove Hamdan's four-door sedan toward defendant's home and parked nearby. Hamdan was in the driver's seat; Mohammed was in the front passenger seat; and the girl was in the back seat. Defendant entered and sat in the back seat, behind the driver.

¶ 86    At trial, Mohammed testified that he handed defendant a phone to inspect, while defendant testified that Mohammed handed him a large bag of marijuana to inspect.[4]   After the inspection, all agree that defendant said he needed to retrieve his money,[5]   and they drove him closer to his apartment building. When defendant returned to the car after going to his home, he again sat in the back seat, behind the driver's seat. This is where the testimony significantly diverges.

---

[4] Defendant testified that it was "a real large bag like you would stuff your fruit in." The contemplated sale, according to defendant, was two ounces of marijuana, for $500.
[5] Defendant testified that he retrieved $500 from his apartment.

¶ 87   At trial, Mohammed testified that, after he (Mohammed) turned toward the back seat to hand defendant the phone again, he saw sparks and was hit by bullets. Three shots hit Mohammed in the chin, neck and chest. Mohammed testified that defendant then pointed the gun at the girl's face and fired; that defendant next shot Hamdan, the driver, in the back; and that defendant shot Mohammed several more times, before defendant exited the car and ran away. Mohammed testified that the shooting lasted "20 seconds not even." The girl also testified that defendant was the shooter and that he pointed the gun at her and shot her in the face and shot her again in her arm as she was escaping from the car. Hamdan, the driver, who was shot in the back, testified that he did not see who was shooting.

¶ 88   In contrast, defendant testified that, after he returned to the car, Mohammed again handed him the bag of marijuana. Defendant inspected it and handed it back to Mohammed, so defendant could count his money. Defendant was counting his money, when Mohammed grabbed $200 in cash from him and pointed a black gun in defendant's face. Defendant smacked Mohammed's arm away, and a shot went off, toward the driver. As defendant and Mohammed struggled over the gun, Mohammed's hands were on the gun, while defendant's hands were on Mohammed's hands. Although the gun went off a number of times, the shooting lasted no more than 30 seconds. At some point, part of Mohammed's body was pulled into the back seat, and part of defendant's body was pulled into the front seat. Defendant twisted Mohammed's wrist to disarm the gun, with the result that the gun was pointed toward Mohammed. When Mohammed let go of the gun, defendant ran off with it.

¶ 89   Mohammed testified that, after the shooting, he also ran away. As he ran, Mohammed caught up with the girl who was running in front of him. But they eventually returned to the scene when he heard police and ambulances arrive. Mohammed was then transported to a

hospital where he was treated and underwent surgery. He testified that he had 11 bullet wounds and 2 graze wounds. Hamdan testified that he (Hamdan) was transported to a hospital, where he remained for a week and also underwent surgery. At the hospital, the girl received stiches and plates in her nose to replace missing bone.

¶ 90    Defendant testified that, after the shooting, he ran into his apartment, hid the gun under a couch, and went to a friend's house. The next day he called his mother who picked him up. Police later recovered from the floor near the couch a black 9-millimeter semiautomatic Glock handgun with an empty 8-capacity magazine.

¶ 91    Police recovered nine Hornady 9-millimeter Luger cartridge casings and two fired projectiles, namely, a fired bullet jacket and a fired bullet. The parties stipulated that a forensic expert, if called to testify, would testify that the nine Hornady 9-millimeter Luger cartridge casings and the two fired projectiles were all fired from the gun removed from defendant's apartment.

¶ 92    In addition to the gun removed from defendant's apartment, police also removed a black Springfield gun from the front seat of Hamdan's car that Hamdan testified was his and that he had a concealed-gun license to carry. Police removed ammunition from the glove compartment that Hamdan testified was also his. A crime scene investigator testified that the bullets in Hamdan's gun magazine were all Blazer—not Hornady—9-millimeter Lugers. The Springfield Armory magazine could hold seven bullets, and there were seven bullets in the magazine, plus one in the chamber, which was also a Blazer 9-millimeter round.

¶ 93    A crime scene investigator testified that he took some photos in and around the car after he arrived at the scene and before the car was towed. The photos showed, among other things, the one fired cartridge casing that was recovered from outside of the car, a fired cartridge casing

on the center part of the floor inside the rear seating area, Hamdan's black gun on the driver's seat, and a ricocheting defect on a nearby car where a bullet had hit but then ricocheted off the side of the nearby car without piercing it. Hamdan's car, in which the shooting occurred, was then towed to a secure facility before anything was recovered from inside it.

¶ 94     When asked whether the location of a projectile indicated where it had been fired from, the crime scene investigator replied: "I can't determine that."   The investigator also recovered a small plastic bag of marijuana from inside a closed duffel bag that was inside the car. From inside the closed glove compartment, he recovered: (1) a box of 9-millimeter ammunition; and (2) a magazine with 7 live Hornady 9-millimeter Luger rounds. The investigator testified that he opened the box and found 25 live rounds:

> "There is 25 but if you can see there's different types of ammunition inside of it. The ones with the red tips those are the Hornady Critical Defense. And there's a different make and model also 9 mm. which is the round copper if you look at the top, they're kind of rounded off which is a full metal jacket bullet."

Although the box was labeled "25 Cartridges Hornady Critical Defense," the investigator explained that the rounds inside the box were "two different makes," that the Hornady ones were the ones with the red tips, and that the rest were Brand WNA. The court interjected and stated: "I count 8 bullets that are full metal and rest are all Hornady."   The investigator agreed.

¶ 95     From inside a closed storage pocket, just below the steering wheel, the investigator recovered $200 in $20 bills, and he spread the bills out to photograph them[6].   The photos show that, although spread out, the bills still retain a small bump or fold in the middle. The investigator

---

[6] The testimony was: "Q. You actually spread them out? A. That's correct."

noted that, in other photos that he had taken, one could see that a fired cartridge case, which had been in the center portion of the mat before towing, had shifted to the rear driver's-side floorboard after the car had been towed. The investigator opined that it "probably moved when it was in transit."

¶ 96    Summarizing the location of the casings that he found, the investigator testified that one was found outside the car and eight were found inside. Of the eight found inside, four were removed from the rear passenger side. Of the remaining four found inside, one was removed from the trunk; one was removed from the front passenger floorboard; one was removed from the rear driver's-side floorboard; and one was removed from the rear dashboard, between the driver's-side rear seat and the rear window.

¶ 97    On recross, in the very last question asked of the investigator, defense counsel asked if the manufacturer stamp on the base of the unfired Hornady rounds in the box matched "all of the fired ammunition," and the investigator answered "yes":

"Q. Just to clarify for the record. The 17 Hornady 9 mm Luger ***, the unfired rounds, the manufacturer stamp on the base of those unfired rounds matches all of the fired ammunition in this case, correct?

A. Same manufacturer and same caliber, yes."

¶ 98    After the close of evidence and argument, the judge gave his ruling. The judge stated that "the devil is in the details," and so he went over the details that he found most important. First, he found that this was "not a self-defense case," and he explained why he so found:

"The first detail is that this is filed as a self-defense case, and it's not a self-defense case. Defendant never says he took a gun and fired it because he was in fear for his

37

safety and shot the victims in this case. It is pseudo self-defense. He's claiming he struggled over a gun and the victims were shot by accident." [7]

¶ 99    The trial court stated defendant was arguing that:

"[Mohammed] had the gun or possession of the gun the entire time; and as [Mohammed] had the gun and defendant struggled *** all of the victims were shot. Not by the defendant. He was merely struggling for a gun that he did not possess. [Defendant] only had his hands on the hands of [Mohammed]. [Mohammed]'s hands were on the trigger *** and [Mohammed] shot all three of the victims, including himself."

After describing defendant's argument, the court found that defendant's argument was, in essence, that the shots were the result of reckless or accidental actions by one of the victims, who shot himself and others.

¶ 100    The second detail that the judge discussed was what he called "the elephant in the room," which was the box of ammunition found in the glove compartment. Seventeen of the rounds in the glove compartment were Hornady 9-millimeter Luger rounds, which were the type of rounds recovered from the crime scene. Regarding this box, the judge observed:

"[T]he defense's argument basically is, this is what the victims are shot by, this shows that this was the victim's gun and not the defendant's gun in this case. And I am going to say something that will probably surprise all of you, but those bullets did not come from that box of ammunition. The fired casings in this case do not match the bullets

_____

[7] Section 7-1 of the Criminal Code of 2012 provides that a "person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself." 720 ILCS 5/7-1(a) (West 2020). Defendant argued that he was justified in using force in his struggle over the gun with Mohammed.

that were in that box.[8] All you need to do is a close look at the details of each of those bullets. Every single one of the fired casings has a gap between the word Luger and Hornady. You can see it on the bottom of each one. As I pull out all of the bullets, the unfired bullets from that box of ammunition, everyone in that [box], they are connected. The 'Luger' and the 'Hornady' are right next to each other, almost touching, the letters. So, in every single one of the fired ones, different setup on the bottom. The words are the same, but how those bullets are[,] in there [,] are different."

¶ 101   The judge then addressed the Hornady bullets that were ostensibly missing" from the Hornady box:

>"Then I looked at the seven additional live bullets that were in the extra clip inside of the glove box. Those all match what's in the box. The missing bullets from the box were in that clip in the glove compartment. They all have, as those do, the lettering right next to each other. Unlike the fired bullets.

The judge then asked a rhetorical question, namely, "is that dispositive of the entire case?" and then he answered his own question:

>"No, it is not dispositive of the entire case. But the defense's biggest fact they wanted to point out to me was, look, they've got 9-millimeter Luger hollow-point bullets here and the victims are shot with 9-millimeter Luger hollow-point bullets. Not from that box of ammunition, they weren't."

---

[8] Defense counsel asked the crime scene investigator about the "manufacturer stamp on the base of those unfired rounds" and whether the ammunition in the box "matches all of the fired ammunition in this case," and the investigator answered "yes." As a result, the court's finding here is arguably contradicted by the investigator's testimony.

¶ 102   The judge emphasized that, to be certain, he "pulled out every single one of the casings" from the box in the glove compartment and "every one has a gap between those words on the bottom."

¶ 103   The third detail the judge discussed was the cash found in the glove compartment. The judge found:

> "Nor was there a struggle over the cash in this case.  Defendant has said that this initially began with a struggle over the cash; it was snatched out of his hand.  There isn't a crinkle on a bill that [was] found in that storage compartment. Not a crinkle.  You can look at all the photographs of it, you can look at how it's neatly folded and placed in that storage compartment. So, what I am asked to believe is that although [Mohammed] snatched it out of the defendant's hands, he did so without crinkling a single bill. That during this massive shootout that happens inside of the car, those bills were then somehow folded neatly, [sic] opened a storage container while they're all being shot, placed into a storage container inside of the vehicle. Because when the police arrive, the two victims aren't even near it, the third victim is lying on the ground in a pool of blood on the outside."

As a result, the trial judge concluded: "So I don't think there was a struggle over any money, and it certainly wasn't [the] $500 that was there." [9]

¶ 104   The next question that the judge discussed was: "what happened to the weed?" The judge observed: "We had a large, what would be a large, two ounces of cannabis, bag of cannabis, and

---

[9] Defendant had testified that the agreement was for him to purchase two ounces of marijuana for $500.

all we have is this small bag. So, our question is \*\*\* where is the weed?" The judge concluded: "So the bag of weed is missing that this was supposedly all about."[10]

¶ 105    Next the judge stated: "I did another test, and that was looking at the weapons."  The judge explained:

> "It was important to me to know which clip went to which gun. The clip inside the glove compartment went only to the Springfield Armory [gun]. It was a Springfield Armory clip. It could only fit in the Springfield Armory [gun], as *I checked up* here.
>
>    The clip that went from the 9-millimeter Glock only fit the 9-millimeter Glock. It was way too wide to slide into the Springfield Armory [gun]. *I tried* that also here." (Emphasis added.)

¶ 106    Turning from the ballistics evidence to evaluating the credibility of the testimony, the trial court found that the victims' version of events was "an improbable story." However, the judge found the defendant' version to be "impossible" based on the physical evidence that the judge had just described. The judge stated:

> "There is, I guess, a difference between improbable and impossible. There is no way that the physical evidence that I'm looking at that occurred in this case occurred the way the defendant said."

However, the judge acquitted defendant of all the attempt murder counts, explaining:

> "What is not clear to me in this case is what his intent was. I cannot tell because I am not absolutely certain of what the real motive was in this case. And because I am not certain

---

[10] Two of the occupants of the car, including the alleged seller, testified that they ran away from the scene, before eventually returning to it.

of that, I am finding the defendant not guilty of all of the attempt murder counts in this

case."

The judge also found defendant not guilty of the armed robbery count because he "was not

certain" of the motive in this case. The judge finished stating: "That's my ruling."

¶ 107   The defense filed on June 3, 2022: (1) a posttrial motion for a new trial, claiming that he

was not proven guilty beyond a reasonable doubt, and (2) a sentencing memorandum that noted,

among other things, that he had no prior history of delinquency or criminal activity.

¶ 108   At the hearing on defendant's posttrial motion, the judge stated that he did not believe

that defendant's claim qualified as self-defense: "when we talk about self-defense, again that

means you're in fear of your life or safety and you fire a weapon to protect yourself."  The judge

noted: "That's not what the defendant was claiming. He was claiming that he tried to protect

himself by pushing the weapon away and it was the victim who kept [accidentally] firing the gun

in this case not the defendant in this case."  The judge stressed: "This case undoubtedly was

decided by ballistics evidence."

¶ 109   The judge explained what he did that neither side had done and how he knew that the

bullets in the box were "clearly stamped at a different facility" than the bullets in the gun:

> "Until this Court got a hold of the actual physical evidence in this case, it seemed
>
> like neither side had a full understanding of the evidence, but it was not matching bullets.
>
> Absolutely 100 percent not the same stamp on the bottom of the casings that were found
>
> in the car that were fired and the bullets that came out of the box. There was a gap
>
> between the lettering. It was a different stamp. While it was the same type of
>
> ammunition.  It was clearly stamped at a different facility. Had a gap that did not exist in

every single one of the bullets in the box differently than the bullets that were found—

I'm sorry not the bullets but the casings that were found on the scene."

¶ 110    The judge explained to the parties how a semiautomatic weapon worked and how this further supported his conclusion:

"[T]he Defendant's story did not in any way match the ballistics evidence that existed in the case. For instance, something I didn't even bother pointing out earlier. This was a semiautomatic weapon. The weapon that was brought to this court has an ejection part on the right side. That means that each time the bullet is fired in a semiautomatic weapon, it ejects the casing to the right.

Almost all [11] of the casings in this case were found on the right side middle, the right side of the backseat of the car. The Defendant's version would have the victim having the gun pointing back at him. Meaning that the right side ejection would put them all on the driver's side of the car. Now I realize casings bound around a little bit and you may find casings that are in different spots, but the bulk of the casings in this case were on the far right side of the vehicle. All consistent with a gun being pointed not from the front seat to the backseat but from the backseat to the front seat. That's why the casings would eject to the right."[12]

---

[11]This "almost all" statement was incorrect. Of the nine casings found "in this case," four were removed from the rear passenger side, one was outside, one was in the trunk; one was on the front passenger floorboard; one was on the rear driver's-side floorboard; and one was in the rear dashboard, behind the driver's-side rear seat.

[12] The crime scene investigator testified that the car was towed before items were recovered from the inside of the car.

The judge observed that the victims in the front seats were shot in the back, which the judge found would have been "impossible" if defendant was "twisting the weapon." Then the judge described what he found to be "the biggest point:"

> "Here is the biggest point. This was a semiautomatic weapon. And for those of you in the courtroom that have fired a semiautomatic weapon or have any experience with them at all and just for myself who does at least have a general knowledge of them more importantly looking at the gun understanding how it fires, a semiautomatic weapon is fired by bullets coming from a magazine. They feed into a chamber. That chamber gets moved up one at a time as the gun gets fired. The way it gets fired is that the bullet explodes, the casing gets thrown out the ejection port, the bullet comes out the front of the gun, and the force of that sends the slide on the top of the weapon backwards therefore peeling off the next round so that the next round can go into it and you can just pull the trigger without cocking the weapon."

After educating the parties about the detailed workings of a semiautomatic weapon, the judge explained how this knowledge led him to what he called the "biggest" point in the case:

> "There is no way how the Defendant described he was holding the weapon that that weapon went off some 14 times. He was holding the top of the weapon, pushing down on it and on the sides of that weapon. A slide cannot keep going back and forth with that kind of pressure on it. That gun could not have kept going and firing in the car the way the Defendant is saying. That is not the way a semiautomatic weapon works."

After giving his opinion that this is "not the way a semiautomatic weapon works," the judge concluded "[a] struggle over the top of it would not have allowed that to go on for several

minutes."[13]  The judge also found that, for the girl "to be shot straight through the face," the "weapon had to be pointed straight at her." Finding that defendant's version was inconsistent with the evidence that the judge had just described, the judge found that defendant was proven guilty beyond a reasonable doubt and denied defendant's posttrial motion for a new trial.

¶ 111   At the sentencing hearing, in addition to letters of mitigation, two witnesses testified on defendant's behalf. The presentence investigation indicated that defendant graduated from high school where he was on the football, basketball and track teams; that he was employed as a cook; that he had no prior juvenile adjudications, adult convictions or gang affiliations; and that he was engaged to be married and had no children. The court observed that defendant was found guilty of three aggravated batteries which each carried a sentencing range of 6 to 30 years. The court found there was serous bodily injury, thereby requiring consecutive sentences and creating a minimum total aggregate sentence of 18 years. The court sentenced defendant to 7 years for each of the three aggravated battery convictions, to be served consecutively, for a total aggregate sentence of 21 years, of which defendant had to serve 85 percent. The court then denied defendant's motion to reconsider sentence. No issues are raised on appeal regarding sentencing. After pronouncing sentence, the judge reiterated his view of the evidence:  "It didn't make sense to me no matter which side of the story you were to believe in this case so that's why I follow the evidence in the case in making my determination." After the sentencing on July 7, 2022, defendant filed a notice of appeal on July 15, 2022, and this timely appeal followed.

¶ 112                                      ANALYSIS

---

[13] Both defendant and Mohammed testified that the shooting lasted 30 seconds or less, not several minutes.

¶ 113   On appeal, defendant claims that the evidence was insufficient and that the trier of fact relied on evidence outside of the record to convict him of aggravated battery.  Section 12-3.05(e)(1) of the Criminal Code of 2012 (Code) provides, in relevant part, that a person commits aggravated battery when, in committing a battery, [14] he or she knowingly and without legal justification, discharges a firearm and causes any injury to another person."  720 ILCS 5/12-3.05(e)(1) (West 2020).  Section 7-1 of the Code provides that a "person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself." 720 ILCS 5/7-1(a) (West 2020). Defendant argued that he was justified in using force as he struggled with Mohammed over the gun.

¶ 114   With respect to his insufficiency claim, defendant argues that no rational trier of fact could have found the evidence sufficient beyond a reasonable doubt, (1) where it was unlikely that defendant would try to kill three people outside of his own apartment building for a cell phone, (2) where the trial judge found defendant's testimony impossible based on the positions of the occupants in the car and the locations of the fired casings but misstated casing locations and failed to consider that casings could have moved during the towing of the car or could have bounced or ricocheted during firing, and (3) where the judge as factfinder stated that he found the victims' account to be "an improbable story."

¶ 115   The standard for evaluating an insufficiency claim is well established. When a criminal conviction is challenged based on the alleged insufficiency of the evidence, a reviewing court must consider all the evidence in the light most favorable to the prosecution and then determine whether any rational trier of fact could have found the essential elements of the crime beyond a

---

[14] A person commits battery if he or she knowingly, without legal justification and by any means, causes bodily harm to another individual.  720 ILCS 5/12-3 (West 2020).

reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48. However, in this endeavor, we are limited to the evidence—that is, the record made before the trial court. *E.g. People v. Harris*, 57 Ill. 2d 228, 231 (1974) ("a trial judge in his deliberations is limited to the record made before him at trial and should he draw conclusions based on any private investigation made by him the accused will have been denied a fair trial").

¶ 116    Defendant further argues that he was denied a fair trial when the trial judge improperly relied on technical information outside of the record in order to find defendant guilty. In response, the State argues that defendant forfeited this argument.

¶ 117    Forfeiture is a limit on the parties not the courts. We normally decline to apply forfeiture when objecting would have been a futile act. *Farmers Auto Insurance Association v. Wroblewski*, 382 Ill. App. 3d 688, 696 (2008) (a formal objection is unnecessary when it is apparent that objection would be futile, particularly where the court has already ruled and rejected a party's arguments *People v. Taylor*, 357 Ill. App. 3d 642, 647 (2005) ("the practical difficulties involved in objecting to the trial court's conduct," coupled with the fundamental importance of a fair trial, "compel a less rigid application of the waiver rule"); *People v. Shoevlin*, 2019 IL App (3d) 170258, ¶ 20 ("an objection by defendant would likely have been futile because it was the trial court that *sua sponte*" made the finding); *People v. Dameron*, 196 Ill. 2d 156, 171 (2001) (application of the waiver rule is relaxed when the basis for the objection is the trial judge's own conduct). In the case at bar, the trial judge made his ruling and was aware that the basis for his ruling was outside the scope of the evidence as presented by the parties. That is why he said this "will probably surprise all of you." It is why he felt compelled to explain the tests that he had done outside the scope of the trial and to explain the knowledge that he had outside of what was presented in the courtroom. He understood that he was going beyond

the trial and he was very clear that it was his intention to base his decision on his own tests and ballistics expertise—none of which had been subject to discovery, as an expert would have been, or to cross-examination. See generally Ill. S. Ct. R. 412(a) (iv) (eff. March 1, 2001). As a result, any objection would have been futile, and the law does not require futile acts.

¶ 118   However, it does not matter whether we examine this under the rubric of impermissible evidence or insufficient evidence, the result is the same. While the testimony of a single credible witness may be enough to satisfy the requirement of sufficient evidence beyond a reasonable doubt, the key word in that sentence is 'credible'—and in the case at bar, the factfinder has already told us that the testimony of the State's event witnesses was "an improbable story."  See *People v. Sauls*, 2022 IL 127732, ¶ 52 ("The positive, credible testimony of a single witness, even if contradicted by the defendant, is sufficient to convict a defendant.").  On appeal, we cannot find that a rational factfinder could have found proof beyond a reasonable doubt based on "an improbable story"—and, in fact, the trial judge told us he did not. He told us that he so found, based on the ballistics evidence; and most of the tests and expertise upon which he relied was not presented to him at trial and, thus, was outside the record. *Dameron*, 196 Ill. 2d at 171-72 (a determination made by the trial judge based upon a private investigation by the judge or upon private knowledge by the judge, untested by cross-examination or any of the rules of evidence, constitutes a denial of due process).

¶ 119   We have not yet reached that point as a society where we would say that the proper assembly and operation of a semi-automatic weapon is common knowledge, as the State argues.[15]  To accept the judge's ruling, we would have to accept, without an expert or cross-

---

[15] In its brief to this court, the State argued that the operation of a semi-automatic weapon is "common knowledge."

examination or the concomitant discovery and disclosure required, that:

> (1) certain sets of bullets were manufactured at different facilities, as opposed to different run-throughs, and therefore could not wind up in the same box:
>
> (2) a magazine from a certain manufacturer cannot fit the semi-automatic weapon of another manufacturer;
>
> (3) the gun could not fire in a 30-second burst during a struggle over it; [16]
>
> (4) the majority of casings would not ricochet during firing and would not move while the car was towed; and
>
> (5) casings would eject to "the right" no matter how the gun was being held or twisted.

¶ 120   To the extent that the reader is thinking "but wait, a jury could have done the same thing, and we never would have known," the answer to that is no, a jury would never have been allowed to retire to the jury room with semi-automatic weapons and live ammunition to see what magazines fit into what guns, for example. They would have been forced to rely on the expert testimony that the State did, or did not, provide.

¶ 121   The court's finding that casings would eject to "the right" no matter how the gun was being held or twisted appears to contradict the testimony of at least one prior State's ballistics expert. In a prior case before this court, we described the testimony of an Illinois State Police ballistics expert as follows: "Though the ejection port on a semiautomatic firearm is supposed to eject the spent cartridge in one direction, [the ballistics expert] testified that, due to numerous variables, there was no reliable way to determine if the cartridge ejects in the same direction every time. Shooter position, type of ammunition used, and the surface the cartridge hits all

---

[16] The court referred to several minutes while the participants testified to 30 seconds or less.

affect where the spent cartridge ultimately lands." *People v. Henderson*, 2017 IL App (1st) 142259, ¶ 78.

¶ 122    The problem with an inability to cross is shown by the defense counsel's last question to the crime scene investigator. Counsel asked about the manufacturer's stamp.  In his question, counsel put the opposite of the court's finding and received a "yes" answer. When the court later made its opposing finding, counsel had no opportunity for follow-up cross-examination about the leap that the court was making from its observation of a space to its expert finding about gun manufacture and packaging.

¶ 123    I would remand for retrial regarding the aggravated batteries of the three victims. Double jeopardy bars further proceedings on the other charges, namely, the armed robbery of Mohammed and the attempt first degree murder of the three victims. However, "in order to remove any suggestion of unfairness, this case should be assigned to a different judge on remand."  Dameron, 196 Ill. 2d at 178.

¶ 124    I would reverse based on both of defendant's claims, finding that there was insufficient evidence in the record, and a due process violation from evidence outside the record. Thus, I must respectfully dissent.